## TAYLOR *v.* HOLMES and others.

*(Circuit Court, W. D. North Carolina.   October Term, 1882.)*

1. EQUITY—RELIEF FROM MISTAKE OF LAW.

    Although a mistake of law furnishes no ground for the interference of a court of equity, yet where there is a plain, admitted, or undisputed mistake of law, arising from ignorance or inadvertence, and the mistake is mutual, equity will relieve.

2. EQUITY JURISPRUDENCE—RULES WHICH GOVERN.

    The federal court can take judicial notice of the laws of the several states of the Union, and in construing the constitution and statutes of a state, and the laws which regulate the rights of property in a state, it will be governed by the decisions of the highest court of the state; but upon legal questions of a more general nature, and in the principles of equity jurisprudence, a federal court is influenced but not bound by the decisions of state courts.

3. EQUITY PLEADING—SUIT BY MARRIED WOMAN.

    A *feme covert* must sue and be sued jointly with her husband, unless she claims a right in opposition to him, when her *prochein ami*, with her consent, may sue on her behalf, and her husband be made party defendant.

4. SAME—NECESSARY PARTIES.

    All parties interested in or entitled to litigate the same questions in controversy, are necessary parties, and must be joined in the suit.

5. DEMURRER—WHAT IT ADMITS.

    A demurrer admits only matters of fact positively alleged, and not conclusions of law, or mere pretenses and suggestions, or the correctness of the ascription of a purpose, when not justified by the fact positively alleged.

6. BILL—WHEN DISMISSED.

A bill in equity, where (1) there is a want of certainty in allegation to show that plaintiffs are entitled to the relief demanded; (2) the right to relief has been barred by the statute of limitations; (3) long and gross negligence of plaintiffs in seeking relief, unexplained by sufficient equitable reasons and circumstances,—will be dismissed.

7. FOREIGN CORPORATIONS—RIGHTS—COMITY OF STATES.

A corporation has no legal existence without the limits of the state which creates it, but where it is authorized by its charter to make contracts and acquire property for the purpose of carrying on its legitimate business, and is invested with the capacity of suing and being sued, it may by comity make contracts and acquire property in other states, and as to such contracts and property may seek the remedies afforded, and is bound by the obligations imposed by the laws of such states.

8. SAME—FORFEITURE OF FRANCHISE.

Causes of forfeiture do not operate *per se*, neither can they be taken advantage of collaterally, nor in any other manner than by a direct proceeding instituted for the purpose against the corporation by the sovereign which created it, and such sovereign may waive the right of forfeiture

9. SAME—SURRENDER OF CHARTER.

A corporation may surrender up its charter and thus determine its existence, but there must be some definite act of surrender, and an acceptance by the sovereign or its duly-appointed agent. A mere non-user of its powers is not a surrender, nor will a court of equity be warranted in presuming a surrender from the abandonment of its franchise in intention only. There must be a declared purpose and act on the part of the corporation to justify such an inference.

10. SAME—DISSOLUTION—RIGHTS OF CREDITORS AND STOCKHOLDERS.

The rights and interests of the creditors and stockholders of a corporation are not extinguished or seriously impaired by its dissolution, and provisions are usually made, either in the charter or by the laws of the state of its creation, for winding up the business and securing such rights and interests.

11. SAME—SUIT BROUGHT BY STOCKHOLDER.

A stockholder may bring suit against the corporation of which he is shareholder, on behalf of himself and associates, in a case where the corporation refuses to bring suit, or where the directors, trustees, or other representatives are guilty of fraud, breach of trust, or are proceeding *ultra vires*, and in such case the corporation and its officers should be parties defendant.

12. SAME—WHAT MUST BE SHOWN.

In a suit by stockholders of a mining corporation to enforce a specific performance of a contract made by the defendants with said corporation, the plaintiffs must show when they became stockholders, and whether they entered into the original enterprise, or for a small price purchased their stock in the market after the failure of the company or the expiration of the charter, and that they requested the directors of the corporation to institute suit against the defendants, and that the directors had trust funds, or were offered proper indemnity for such legal proceedings; and the time when any of the directors died, or when and how they resigned office.

13. TRUST—ACCEPTANCE OF.

A voluntary or express trust cannot be imposed on any one unless he agrees to accept, or by clear implication assumes the duties and liabilities;

while acceptance in a case of an implied, resulting, or constructive trust is not necessary, the law holding him liable to the performance of such trust whether he is willing or unwilling to accept the trust.

14. SAME—CONTRACT FOR SALE OF LAND.

A binding contract for sale of land enforceable in equity, though in fact unexecuted, is considered as performed, and the land is in equity the property of the vendee. When the vendee has paid all the purchase money he has a complete equitable estate, and the vendor is a mere trustee of the legal title, and if the vendee has paid only a part of the purchase money, the vendor is a trustee to the extent of the amount paid.

15. SAME—IMPLIED TRUST—VENDOR.

Where a person, for a valuable consideration, contracts in writing to sell lands to the use and benefit of another, an implied trust arises in favor of the vendee against the vendor and his representatives, and those claiming under him.

16. SAME—STATUTE OF LIMITATIONS.

Where a trust arises by implication out of the agreement of parties, and there is no conflict of claim or adverse possession between the vendee and *cestui que trust*, statutes of limitation do not apply; but where there is a conflict of claim, and the party having the legal estate holds adversely, the statute of limitations will protect the one having the legal title, and who is sought to be converted into a trustee by a decree founded upon fraud, breach of trust, or some inequitable advantage obtained by him.

17. SAME—RULE OF PROPERTY.

Federal courts, in passing upon questions relating to property in the several states, recognize statutes of limitations, and give them the construction and effect that are given by local tribunals; and they will consider equitable rights as barred by the same limitations, where nothing has been done or said directly or indirectly to recognize such equitable claims by the adverse possessor.

In Equity.

*A. B. Conger* and *D. M. Furches*, for plaintiffs.

*J. M. McCorkle*, for defendants.

DICK, D. J. The general demurrer of the defendants is a denial, in form and substance, of the right of the plaintiffs to have their case considered and acted upon by the court, and is an admission of the truth of the allegations of the matters of fact set forth in the bill which are properly pleaded.

It is necessary, therefore, for the court to consider what are the allegations of material facts which are set forth in the bill; whether they are stated in direct terms and with sufficient precision to show that there is a definite equity in behalf of the plaintiffs, entitling them to the relief demanded; whether the plaintiffs have lost their right to relief by the bar of a statute of limitations, or by lapse of time, unexplained by proper equitable circumstances; and whether all necessary parties have been made, so that the court can put an end to the litigation by adjusting and settling in this suit the rights of

all persons who are interested in or affected by the subject-matter in controversy.

As there was considerable discussion by counsel as to the force and effect of a demurrer, and as to the extent that it can be made available in defense, I will state briefly some of the well-settled principles on this subject. A demurrer is applicable to any defense which may be made out from the allegations in a bill; but the most ordinary grounds of demurrer are want of jurisdiction, want of equity, multifariousness, and want of parties. By demurrer a defendant may properly insist upon staleness of claim, the statute of limitations, and long acquiescence in his adverse possession and claim.

The protestation usually inserted in a demurrer is a practice derived from the common law, and has no effect in limiting admissions as to facts properly alleged in the pending suit.

The formal statement of causes of demurrer, though usual, is not absolutely necessary. The assertion of a general demurrer is that the plaintiff has not, on his own showing, made out a case. If the causes of demurrer are not formally set forth, the plaintiff may object, and require them to be thus stated. If the defendant assigns causes of demurrer *ore tenus* he will not generally be entitled to costs; for if the objections had been formally stated, the plaintiff might have submitted to the demurrer and asked leave to amend his bill.

Where a demurrer for want of parties is filed, the demurrer should point out the proper parties, and thus give the plaintiff an opportunity to amend; but this rule does not apply where it appears from the face of the bill that the plaintiff has sufficient information as to the names, interests, and residences of the proper parties. If the objection as to parties be made *ore tenus* at the hearing, the plaintiff will be allowed to amend without costs.

In order to present clearly the questions of law discussed and decided in this case, I will give a brief outline of the material allegations in the bill.

The plaintiffs allege that they are the owners and holders of nearly three-fourths of the stock issued by the Gold Hill Mining Company, a corporation duly created and organized under the laws of New York on the thirtieth of August, 1853, for the purpose of carrying on the business of mining in the county of Rowan and state of North Carolina. The capital stock was fixed at $1,000,000, in 200,000 shares, at $5 a share; and the corporation was to continue for 25 years; and

its principal place of business was in the city of New York. That on the first day of September, 1853, the defendant Moses L. Holmes offered and agreed to sell the property in controversy to certain persons for the benefit of said corporation, and convey the same by unquestionable titles. The amount which he was personally to receive for such sale and conveyance was $151,000, and 30,000 shares of the stock of the corporation. The company also agreed to pay off incumbrances to be placed on the property to the amount of $125,000. The other defendants, being interested in the said property, agreed upon the receipt of their share of the purchase money to join in a conveyance with said Moses L. Holmes, and they all did on the fourth day of October, 1853, execute a deed to the president and directors of said company, for the consideration then stipulated and fixed at $299,500, conveying six tracts of land, containing in all 517 acres, etc. This deed was, in some respects, imperfect, and did not convey a fee-simple title for the want of proper words of limitation to convey a fee. On the ninth day of July, 1855, the defendants executed another deed for said property to Isaac H. Smith, president, his successors and assigns, in trust that he should stand seized and possessed thereof for the benefit of the company, etc.

This deed was defective in not containing appropriate words of limitation to convey a fee as contemplated by the parties to the contracts of sale. The said Isaac H. Smith died in 1858, and never made or attempted to make a conveyance of said property.

The bill further alleges that the defendants were acting trustees and superintendents of the company from the commencement of its operations until December, 1860, when the last incumbrance was removed, the company then being left in debt over $40,000, as the result of its operations, besides $20,000 assessed on its stock.

The bill then alleges that the defendants, knowing that there were not proper words of limitation in the said deed to Isaac H. Smith to convey the fee, and that on his death they held the legal title as reversioners, and that they were bound to execute the trusts arising from their contracts with the company, neglected and refused to execute proper deeds to carry out such trusts, but on the tenth day of July, 1861, by threats and armed violence, did drive off the servants and agents of the company, and take possession of all the property then owned by the company at Gold Hill, convert the rents and profits to their own use, and caused the said property to be sold under attachments, and thereafter pretended that they had acquired a perfect title, and have also fraudulently suffered said lands to be sold,

and incumbered with mortgages which are clouds upon the title of the company, etc.

The bill further alleges that the company, besides the purchase money mentioned in said deeds, spent large sums in purchasing other real estate at Gold Hill, and in improvements thereon, of all which it had possession until July 10, 1861, thereafter becoming "utterly disorganized;" its directors holding no meetings after 1862, and only one of the directors now survives, and he incompetent and neglecting to protect its rights, and those of its stockholders and creditors.

The bill further alleges that the *feme* plaintiff was married in 1864, and still remains under the disability of coverture. The prayer for relief is that the defendants be required to execute proper deeds and conveyances according to their contracts with the Gold Mill Mining Company, to a trustee appointed by the court to hold to the use of the creditors and stockholders of said company; and that said defendants be compelled to account for personal property used and destroyed, and for rents and profits since July 10, 1861, etc.

When we consider the terms of the original contract of August 30, 1853, and of other subsequent contracts, and the language of the deeds of October 4, 1853, and July 9, 1855, and all the circumstances attending the whole transaction, we conclude that the manifest intent and object of all parties were that the said deeds should convey a fee-simple title to the lands mentioned, and that this intent and object were not accomplished on account of the mutual mistake of the parties, and the inadvertence or unskillfulness of the draftsman in not using appropriate words of limitation in the deeds. Although it is a general rule that a mistake of law furnishes no ground for the interference of a court of equity, yet this rule is sometimes departed from when there is a plain, admitted, or undisputed mistake of law arising from ignorance or inadvertence. *Snell* v. *Ins. Co.* 98 U. S. 85.

There could scarcely be a clearer case for a court of equity, if applied to by proper parties, in proper time, and in a proper manner, to interfere and furnish adequate relief by exercising its powers of correction of written instruments, and specifically enforcing contracts for the sale of land. The contracts were in writing, within the provisions of the statute of frauds; they were certain and fair in all their parts; they were founded upon valuable and adequate considerations paid and received by the respective parties. The officers of the corporation were put in possession of the premises, and expended large sums of money in buildings, repairs, and improvements; the vendors were capable, and could easily perform the agreements of the contracts, and

the errors in the deeds were caused by the mutual mistake of the parties. Nearly all the elements which constitute the equity for correction and specific performance are to be found in this transaction.

It is a well-settled principle in equity jurisprudence that where a person for valuable consideration contracts in writing to sell lands to the use and benefit of another, an implied trust arises in favor of the vendee against the vendor and his representatives, and those claiming under him as volunteers or with notice of the contract. When things are thus contracted to be done, equity treats them, for many purposes, as if they were done, and will specifically enforce such contracts by decreeing a proper conveyance, or correcting a conveyance which fails to accomplish the purposes of the parties.

The right of specific performance accrued to the corporation in this case at the time it complied with the contracts of sale, and the equitable right of correction accrued at the time of the execution of the defective deeds, on the fourth of October, 1853, and, the ninth of July, 1855.

The corporation never instituted any suit for the enforcement of these clear and definite equities, and we will now consider whether the plaintiffs, by the statements in their bill, have shown themselves entitled, after so long a lapse of time and after such material changes in circumstances, to the relief which they demand.

In considering the questions involved in this suit I will notice some of the many causes of demurrer assigned, and follow, as near as possible, the line of argument adopted by the counsel of the parties.

The counsel of the defendants presents these legal propositions: "The bill shows that the Gold Hill Mining Company was created under the laws of New York, and all remedies affecting the rights of stockholders and creditors must be governed by the laws of that state, and this court, differing from the rules prevailing in state courts, takes judicial notice of the laws of New York." I assent only to a part of these legal propositions. This court can take judicial notice of the laws of the several states of the Union, and in construing the constitution and statute laws of a state, and the laws which regulate the rights of property in such state, will be governed by the decisions of its highest courts; but upon other legal questions of a more general nature, and in the principles of equity jurisprudence, a federal court is influenced by but not bound to follow decisions of state courts.

When a corporation is created by a state statute, its powers, duties, and privileges, and the mode of exercising them, must depend upon the laws of the state which created it, and it can make no contracts

and do no acts within or without such state except such as are authorized by its charter. It has no legal existence without the limits of such state. But where it is authorized by its charter to make contracts and acquire property, in general terms, for the purpose of carrying on its legitimate business, and is invested with the capacity of suing and being sued, it may, by the comity which is recognized to the fullest extent in this country, make contracts and acquire property in other states, and as to such contracts and property may seek the remedies afforded, and is bound by the obligations imposed by the laws of such states. *Bank of Augusta* v. *Earle*, 13 Pet. 519.

As the Gold Hill Mining Company was authorized by its charter to make contracts and acquire property for the purpose of carrying on its business, and made contracts within the scope of its authority as to real and personal property in this state, by which it acquired legal and equitable interests, its rights and remedies as to such property must be governed by the laws of this state.

It is further insisted by the counsel of the defendants that as the Gold Hill Mining Company failed or neglected to pay its debts, and suspended its lawful and ordinary business for more than a year subsequent to its disorganization in 1861, it was dissolved by virtue of the provisions of a statute of New York. 2 Rev. St. N. Y. p. 706, § 46.

I have not here referred to any decision of the highest court of that state furnishing a construction as to the force and effect of said statute, and I cannot assent to the construction insisted upon by the counsel of defendants.

Causes of forfeiture do not operate *per se*, neither can they be taken advantage of collaterally, nor in any other manner than by a direct proceeding instituted for the purpose against the corporation, so that it may have an opportunity to answer. Such proceedings can be instituted by no one but the sovereign which created the corporation, and such sovereign may waive the right of forfeiture. Proceedings to enforce forfeitures belong to the common-law jurisdiction of courts, and courts of chancery do not deal with such questions unless empowered to do so by express statute. They can deal with officers of corporations as trustees for any abuse of their trusts or failure in the performance of duty. Neither the insolvency of the Gold Hill Mining Company, nor the failure of the corporation to elect officers at the appointed time, operated as a dissolution or was a virtual surrender of its franchises. A private corporation in this country is not composed of integral parts which are essential to its existence. The

stockholders compose the company. The directors and officers are agents necessary for the active management of the affairs of the company, but they are not integral parts essential to its existence. A corporation possesses strong and tenacious principles of vitality, derived from its charter bestowed by sovereign authority, and does not cease to exist until its dissolution is accomplished in a manner provided by law.

A corporation may surrender its charter to the sovereign power that created it, and thus determine its existence, but there must be some definite act of surrender, and an acceptance by the sovereign or its duly-authorized agent. Mere non-user of its powers is not a surrender, and a court would not be warranted in presuming a surrender from the abandonment of its franchises in intention only; there must be a declared purpose and act on the part of the corporation to justify such an inference. In the charter of the Gold Hill Mining Company, and in the laws of New York, ample provisions were made to enable the company to effect a reorganization and put in operation its suspended powers. As the directors who controlled the affairs of the company in 1862 were trustees of an express trust which they had voluntarily accepted, they could not divest themselves of that trust by a resignation of office without the assent of the corporation, and before successors were appointed, and a court of equity, upon proper application, would have compelled them to have taken such steps as were necessary to secure the rights and interests of the creditors and stockholders of the company.

As the Gold Hill Mining Company was not dissolved in any manner provided or recognized by law, it remained a corporation until September 1, 1878, when its corporate existence expired by the express limitation of its charter.

The rights and interests of the creditors and stockholders of a corporation are not extinguished or seriously impaired by its dissolution. Provisions are usually made, either in the charter or by the laws of the state, for winding up the business and securing the rights and interests of the stockholders and creditors in all trading, business, and moneyed corporations. Equity regards the capital, property, and debts of such corporations as trust funds pledged for the payment of the dues of creditors and stockholders, and has ample power to reach such trust funds, and collect and apply them to the purposes of the trust. *Bacon* v. *Robertson*, 18 How. 480.

There was much learned discussion in the argument as to the power of stockholders to institute a suit to enforce the rights of a cor-

poration. The general doctrine on this subject, and its limitations, is well stated in *Dodge* v. *Woolsey*, 18 How. 331, and *Hawes* v. *Oakland*, 104 U. S. 450. It is well settled that a stockholder may sue the corporation to prevent or be relieved against fraud or breach of trust on the part of directors or trustees, and to restrain them from exercising powers outside of their chartered authority. As to matters which affect the rights and interest of a corporation, the general rule is, the corporation must sue to redress or prevent a wrong and secure a benefit; but a stockholder may bring a suit in behalf of himself and associates in a case where the corporation refuses to bring suit, or when the directors, trustees, or other representatives are guilty of a fraud, a breach of trust, or are proceeding *ultra vires*. In such a case the corporation and its officers or other representatives should be parties, so that they may have an opportunity of explanation and defense, and be bound by the decree, and thus prevented from bringing another suit involving precisely the same subject-matter. *Davenport* v. *Dows*, 18 Wall. 626.

In the case before us the charter of the corporation had expired, by effluxion of time, four years before the bringing of this suit by the plaintiff stockholders. In the case of the dissolution of a corporation, provision is made in section 9, p. 557, of the Revised Statutes of New York to authorize the existing directors or managers of such corporation, as trustees, to wind up the business of the company. From the bill in this case it appears that there were directors of the corporation at the time it suspended business in 1861, and they acted until 1862, and were in no way relieved from their duties and responsibilities by any act of the corporation, and one of such directors still survives. In a subsequent part of this opinion I will consider the question whether this surviving director is a necessary or indispensable party to this suit.

It is insisted by the counsel of the defendants that the plaintiffs, by their statements in their bill, have not shown themselves entitled to the interposition of a court of equity to grant them the relief prayed; that they have not stated positively and with sufficient certainty facts essential to their rights and within their own knowledge. They have not shown themselves to have been stockholders at the time the corporation acquired the equity which they seek to enforce, or the time when they became stockholders; whether they paid par value for their stock, or purchased it when it was greatly depreciated by the indebtedness, embarrassment, and disorganization of the company, or became owners of such stock after the expiration of the

charter. They have not shown that they made any effort to reorganize the company, which they could easily have done under the laws of New York, and by the chartered powers of the corporation, as they were the owners of a large majority of shares of stock. They have not shown that they requested the directors or trustees of the corporation to institute suit for the enforcement of their rights. They have shown that the corporation was largely indebted in 1860, and have not shown that the directors had sufficient corporation funds to carry on proper litigation, or that means and suitable indemnity were offered to such directors. They have not shown that they at any time made earnest, or even reasonable efforts for the redress of grievances complained of during the existence of the corporation, or with the trustees upon whom the rights of the corporation devolved upon its suspension of business or its dissolution.

These suggestions, made by the counsel of defendants, have received my careful consideration, and I regard them as having a material bearing upon the case, and I will state my conclusions upon the subject in a subsequent part of this opinion.

The chief causes of demurrer relied upon by the defendants to defeat the suit of the plaintiffs are the statute of limitations, lapse of time, and staleness of claim.

In passing upon these questions it becomes necessary for me to consider the nature of the trust which existed between the defendants and the corporation arising out of the contracts and transactions between the parties in relation to the property in controversy. A binding contract for the sale of land enforceable in equity, though in fact unexecuted, is considered as performed, and the land is in equity the property of the vendee, and will devolve in a course of descent upon the heir of the vendee. When the vendee has paid all the purchase money he has a complete equitable estate, and the vendor is a mere trustee of the legal title. If the vendee has paid only a part of the purchase money, then the vendor is a trustee to the extent of the money paid, and the vendee cannot demand the legal title until he has complied with the terms of the contract; but still there is an implied trust arising out of the presumed intention and consent of the parties that the vendor will make a transfer of the legal title when the balance of the purchase money is paid. In the case of a trust arising by implication out of the agreement of parties, as there is no conflict of claim or adverse possession between the trustee and *cestui que trust*, statutes of limitation do not apply until these consistent relations of the parties are changed into conflicting and adverse claims.

In the case of a constructive trust there is always some conflict of claim, and the party having the legal estate holds adversely, and does not become a trustee until he is converted into one by a decree founded upon fraud, breach of trust, or some inequitable benefit or advantage obtained by a person occupying a fiduciary relation to another.

In such cases of constructive trusts the statute of limitations will protect one who has the legal title and is sought to be converted into a trustee against his assent, and it begins to run from the time when the equitable rights of the other party accrued. *Taylor* v. *Dawson*, 3 Jones, Eq. 86.

The written contracts in this case did not create an express trust. There were no direct and express terms of trust imposed by the makers. Voluntary or express trusts cannot be imposed upon any person unless he agrees to accept or by clear implication assumes the duties and liabilities. Acceptance of a trust in the case of an implied, resulting, or constructive trust is not necessary, as the law holds a person liable to the performance of such trust, whether he is willing or unwilling to accept the situation.

It is insisted by the plaintiffs that in this case there is a constructive trust arising out of the fraudulent conduct of the defendants, and that length of time will not operate as a bar to a suit in equity where such fraud is admitted by the demurrer of the defendants. To sustain this position there must not only be shown an established trust, but some *actual* and *intentional* fraud practiced upon a *cestui que trust* by a trustee, which has been concealed from the *cestui que trust*. *Clarke* v. *Boorman*, 18 Wall. 493; *Godden* v. *Kimmell*, 99 U. S. 201.

A demurrer only admits matters of fact positively alleged, and not conclusions of law or mere pretenses and suggestions, nor the correctness of the ascription of a purpose to parties when not justified by the language used and facts positively alleged. *Dillon* v. *Barnard*, 21 Wall. 430.

The mere allegation in the bill that the defendants knew of the existence of the legal defects in the said deed, and neglected and refused to rectify the same, is not sufficient to imply constructive fraud, as the agents of the corporation had full knowledge of the defect or the means of such knowledge in their hands. There is no direct averment that the defendants were ever requested to rectify such deeds. The error in the deed was a plain mistake of a clear and well-settled principle of law, and it is upon the ground that there was a mutual mistake of law, caused by ignorance or inadvertence, that the plaintiffs can claim the interference of a court of equity to

grant relief. Ignorance of law by one party to a contract is not generally a ground for relief in equity, as a party to a contract is presumed to know the law which affects his rights and obligations.

In the matters of fact positively alleged in this case there are none of the elements of actual and intentional fraud. The defendants did not misrepresent any material matter to produce a false impression, or in any way mislead the agents of the corporation to obtain undue advantages.

There was no evil act with an evil intent. They did not conceal any material facts or remain silent as to any. The want of proper words of limitation in the deeds to convey a fee-simple title to the lands was as well known to the agents of the corporation as to the defendants, or such agents might easily have acquired information as to such defects, as the deeds were duly accepted and registered by them, and constituted a link in the chain of title to lands in which they had undisturbed possession for more than six years.

No statute of limitations began to run against the corporation while its agents were in possession, and the defendants, as implied trustees, had not disputed the equitable rights of the corporation, or set up any adverse claim. When the defendants took forcible adverse possession of the lands and other property in 1861, the statute of limitations had been suspended in this state by legislative enactments, and remained suspended until January 1, 1870. From that date the statute of limitations began to run in favor of the defendants, as they held the possession of the lands adversely to the Gold Hill Mining Company. As possession was thus held adversely for more than seven years under the legal title, and with known and visible boundaries, the legal and equitable claims of said corporation were barred. Bat. Rev. 147.

As such corporation was agent and representative of the stockholders, who were entitled to rights and interests by and through the corporation, I am inclined to think that the stockholders were also barred, and the coverture of the *feme* plaintiff did not prevent the bar as to her rights. *Wellborne* v. *Finley,* 7 Jones, 228; 2 Perry, Trust. § 458; *Herndon* v. *Pratt,* 6 Jones, Eq. 327; *Kerrison* v. *Stewart,* 93 U. S. 155.

The fact that the plaintiffs were non-residents of the state did not prevent the operation of the statute of limitations, (*Harris* v. *Harris,* 71 N. C. 174,) and this construction of the statute was adopted by the supreme court of the United States in *Davie* v. *Briggs,* 97 U. S. 628.

The force and effect of the statute of limitations was not only to bar the remedy of the corporation, but to extinguish its rights, and vest a perfect title in the adverse holders.

Federal courts, in passing upon questions relating to property situated in the several states, recognize statutes of limitations, and give them the same construction and effect that are given by the local tribunals.

When a statute of limitations applies to a legal proceeding or a legal right, courts of equity will in analogous cases consider equitable rights as barred by the same limitations, where nothing has been done or said directly or indirectly to recognize such equitable claims by the adverse possessor. *Elmendorf* v. *Taylor,* 10 Wheat. 152.

A statute of limitations, where it applies, is an absolute bar, and allegations of justness of claim, ignorance, or any kind of hardship cannot avoid its operation. If such circumstances were allowed to control, there would be no end to litigation and no certain rules of property. 2 Perry, Trust. 484.

Statutes of limitation are founded in a wise and salutary public policy, and promote the peace and well-being of society by quieting titles to property, and putting an end to stale demands.

It was insisted by the defendants that, without reference to any statute of limitations, courts of equity have adopted the principle that unreasonable delay in the assertion of a right by suit will defeat recovery or relief, and questions as to laches and lapse of time are to be determined by the particular circumstances of each case. We will briefly consider this matter, as it was elaborately discussed by counsel on both sides of the case.

In 1855, upon the execution of the defective deed to Isaac H. Smith by the defendants, the corporation had a clear and definite equity for the correction of said deed, as it was founded upon a large, valuable, and adequate consideration, and the defects in the conveyance resulted from a mutual mistake of the parties. The corporation, through its officers and agents, took possession of the premises, made large expenditures for improvements, and continued to exercise control over the property until 1861. At this period it was so much embarrassed by debts that it was unable to carry on its business and became "completely disorganized."

These embarrassments could not then be relieved by any efforts of the stockholders, as most of them were citizens of the northern states, and were excluded from the limits of this state by the disturbed condition of public affairs produced by a civil war. It is alleged that

the defendants, who were stockholders, and had been directors and managers of the business of the corporation, with armed violence took possession of the property and drove off the agents of the corporation, and have continued to this time to hold possession, receive rents and profits, and have mortgaged and otherwise dealt with the property as absolute owners.

Upon this statement of facts, if the plaintiffs, in their bill, had shown any·plausible reason for their long delay in asserting their rights, and if lapse of time was the only defense interposed by the defendants, I would overrule the demurrer and require them to answer such grave charges of injustice, wrong, and oppression against the absent stockholders with whom they had been associated in fiduciary and friendly relations.

It appears from the bill that about 500 acres of land were purchased from the defendant for mining purposes; that the capital stock of the company was fixed by the charter at $1,000,000, in shares of $5 each; that the business was regularly carried on for more than six years; that the company in December, 1860, owed $40,000 of indebtedness, and had not sufficient available assets to discharge the same; and that the company became "utterly disorganized" and ceased to exercise its corporate functions.

We may well infer from these facts and circumstances disclosed in the bill, and from the history of such hazardous enterprises, that the mining venture of the company became a failure, that the land became greatly depreciated in value, and the large amount of shares of stock which were issued became almost worthless, and could be purchased at a nominal value. We may also well infer that the creditors of the company made some efforts to collect or secure their debts out of the general wreck of the hazardous and unfortunate enterprise. After such long delay in asserting their rights, the plaintiffs ought to show some equitable reason for such delay, and substantial merits to repel such unfavorable inferences.

The plaintiffs have not shown when they became stockholders; whether they entered into the original enterprise, or for a small price purchased the stock in the market after the failure of the company or after the expiration of its charter. If they were stockholders in 1861, at the time of the disorganization of the company, they have not shown that they made any effort to reorganize the company, which they could easily have done under the provisions of its charter and the laws of New York.

The disturbed condition of public and private business which prevailed in this state during the civil war did not prevail in New York, where the corporation had its chartered existence and where most of the holders of stock resided. After the termination of the civil war in 1865 the state and federal courts were open for the administration of justice, and the rights of property, of which the plaintiffs were temporarily deprived by the armed violence of the defendants, could easily have been restored by the courts, or the military power that prevailed in this state for three years. The rights of property of citizens of the northern states were not affected by the statutes of limitations, or legal proceedings in the courts of the insurrectionary states during the civil war.

As the plaintiffs have not set forth their claims with sufficient certainty, and have not assigned any reasons why they have so long slept upon their rights, they cannot properly complain at the operation of well-settled principles of equity jurisprudence upon the subject which have been adopted and are enforced for the peace and well-being of society. *Badger* v. *Badger,* 2 Wall. 87; *Hawes* v. *Oakland,* 104 U. S. 450.

There can be no fixed and definite rule established by a court of equity as to what delay in asserting a right will amount to an equitable bar from lapse of time, as there are different circumstances and elements involved in each case. I think, however, that the principle insisted upon by the counsel of defendants in his brief is well sustained by reason and authority; that " in mining property, which is hazardous, uncertain, and speculative, greater diligence is required in asking for the specific performance of contracts relating to mining lands than to other lands." Leading Cases on Mines, etc., 397; *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587.

As my decision in this case may be reviewed in the supreme court, I feel it to be just to the defendants to consider other causes of demurrer which have been assigned.

The defendants insist that this bill cannot be sustained in behalf of the *feme* plaintiff, as it appears that she is a *feme covert* suing in her own name, and her husband is not made a party. The rules of equity pleading upon this subject are too familiar and well settled to need discussion or much citation of authority. A *feme covert* must sue and be sued jointly with her husband, unless she claims a right in opposition to him, in which case her *prochien ami,* with her consent, may exhibit a bill in her behalf, and her husband be made a

party defendant. Courts of equity will in some cases recognize a *feme covert* as capable of disposing of her .separate property and doing other acts as a *feme sole.* She may in some instances act as a trustee, or execute a power, without the concurrence of her husband, if such act does not defeat a right of the husband, or impose a legal responsibility upon him. But in all suits in equity in which a *feme covert* sues or is sued, the husband must be a party plaintiff or defendant whenever he is within the jurisdiction of the court and can be made a party. Story, Eq. Pl. § 63; 2 Story, Eq. Jur. § 1368.

The rules of equity pleading upon this subject are not affected in any manner in this court by the right which a *feme covert* may have to institute suits in her own name, under state laws, as the practice act of 1872 (Rev. St. § 914) does not apply to the pleadings and modes of procedure in federal courts of equity. *Blease* v. *Garlington,* 92 U. S. 1.

The bill does not show whether the interests of the *feme* plaintiff are adverse to, or in conformity with, those of her husband. If it appeared that she is suing for her separate estate and the husband refused to join with her in the suit, I would allow a proper amendment, so as to introduce a *prochien ami* and make her husband a defendant; and this amendment would not oust the jurisdiction of the court on account of the same citizenship of the parties, as the husband defendant would be only a formal party. *Wormly* v. *Wormly* 8 Wheat. 451.

If, however, the husband has a substantial adverse interest to the *feme* plaintiff, then such amendment could not be allowed. The husband is an indispensable party to a suit in equity where the wife sues or is sued, and his non-joinder is sufficient cause for the dismission of a bill, if an amendment making him a party cannot properly be allowed.

It is a general rule in equity that all parties interested in or entitled to litigate the same questions in controversy are necessary parties. They must be expressly made parties, or the bill must be so framed as to give them an opportunity to come in and be made parties. This principle is only departed from when it is extremely difficult or inconvenient to enforce this rule. This general principle has in some degree been modified by section 733, Rev. St., and the twenty-second and forty-seventh rules adopted by the supreme court for the regulation of the practice of United States courts of equity. By virtue of this statute and these rules courts of equity may dispense with merely formal parties; and in cases where the real merits

of the cause may be determined without essentially affecting the interests of absent parties, whose interests are separable from the other litigants, it may be the duty of such courts to make a decree as to the parties before them. But neither the act of congress nor the rules of the supreme court enables the circuit court to make a decree in equity in the absence of an *indispensable* party whose rights must necessarily be affected by such decree.

This principle is founded upon the broad ground of natural equity and justice that prevails in all systems of enlightened jurisprudence, that no court ought to adjudicate directly upon a person's rights without the party being either actually or constructively before the court, with opportunity for explanation and defense.

Although it is a general rule in chancery that a bill will not be dismissed for the want of proper parties, yet if, upon the hearing of a bill, the court sees that an indispensable party is not on the record, and cannot be made a party without ousting its jurisdiction, it will refuse to proceed, and dismiss the bill. *Shields* v. *Barrow,* 17 How. 130; *Bank* v. *Railroad,* 11 Wall. 624.

There are other questions which were presented in the pleadings, and they were insisted on in the argument, as to what were the rights and interests of the creditors of the corporation for whom relief is asked in the prayer of the bill; and what were the rights, duties, and responsibilities of the directors of the Gold Hill Mining Company.

All the rights, interests, and property of an insolvent or dissolved corporation constitute a trust fund, and are held,—*First,* for the payment of creditors; and, *second,* for the benefit of the stockholders.

It appears on the face of the bill that at the time the corporation suspended the exercise of its functions and franchises in 1861 there were creditors to the amount of $40,000, and there were no available assets for immediate payment. There was an assessment on the stock to the amount of $20,000, but it does not appear that the same was collected and applied in payment of debts.

It in no way appears that the prior and exclusive equities of creditors have ever been adjusted and discharged by the corporation assets. Under such circumstances it seems to me that this court cannot proceed to make a decree as to the secondary and subordinate equities of the stockholders to the property of a once insolvent and now dissolved corporation, unless the existing creditors (if there be any) are in some way represented in this suit. This is a stockholder's bill, and they cannot properly represent the rights and inter-

ests of creditors, which are not identical with those of the plaintiff, but different, superior, and conflicting. But for the prayer in the bill for relief in behalf of creditors, I would suppose that all the claims of the creditors had been satisfied and discharged under proper legal and equitable remedies afforded by the courts, or had been barred by the statute of limitations. The creditors could have reached the property of the corporation by legal and equitable process and I cannot imagine any reason why they should have slept upon their rights for 20 years. If the property was sold under proper legal process the purchasers acquired good titles. If the defendants, who were trustees, purchased the property (as is intimated in the bill) at a fair and open sale under legal process, and at the highest price that it would bring at auction, this transaction was neither fraudulent nor void. It may be that on account of their fiduciary relation to the corporation and the stockholders they might in a reasonable time have been declared trustees for the *cestuis que trust*. In such cases the *cestuis que trust* must seek their relief in reasonable time, and we have already considered sufficiently the facts and circumstances of this case as to the reasonable diligence of the plaintiffs in seeking relief. *Twin Lick Oil Co.* v. *Marbury, supra.*

It appears in the bill that there were directors in 1861 when the corporation suspended business, and that they continued to act until 1862, and they were not discharged from their duties and responsibilities in any manner provided in the charter or the laws of the state of New York. As directors they were strict trustees of the creditors and stockholders, and it was their duty to have taken care of the corporate property under their control, and to have maintained the rights and consulted the advantages of their *cestuis que trust* by instituting proper legal proceedings to enable them to perform the duties of the trust with which they were invested.

The bill does not allege that the directors were requested to institute suit against the defendants, or that they had the trust funds, or were offered proper indemnity for such legal proceedings. It was the duty of the directors or trustees to have rendered proper accounts of their transactions, showing what disposition they had made of the property under their control.

When a direct trust is unclosed the statute of limitations does not protect trustees or their legal representatives from liability.

As the directors were strict trustees, and voluntarily accepted the trust, they could not divest themselves of the trust by a resignation

unaccepted by the *cestuis que trust,* unless some other method was pro-- vided in the charter or by the laws of the land.

The bill does not show when any of the directors died, or when or how any of them resigned office. If the trust of the directors was continued by a failure of the corporation to elect other directors as successors in office, then it may be that the directors who were living in 1878, when the corporation was dissolved by the expiration of its charter, became trustees of the rights and property of such corporation by virtue of the statute of New York. 1 Rev. St. § 9, p. 557.

The allegations in the bill are admitted by the defendants, so far as they are affected by such allegations; but such admissions do not dispose of the rights and responsibilities of the directors and their legal representatives, who are not parties.

It seems to me that the directors or their legal representatives ought to be made parties, so that they may have an opportunity of being heard, and have the whole subject-matter in controversy so adjusted and settled by a decree of this court as to free them from the duties and liabilities of future litigation.

I will not further consider or determine this question, as there are other sufficient causes for the dismissal of the bill.

I will dismiss the bill on the following grounds:

(1) Want of certainty in allegation to show that the plaintiffs are entitled to the relief demanded.

(2) The right to relief has been barred by the statute of limitations.

(3) The long and gross negligence of the plaintiffs in seeking relief, unexplained by sufficient equitable reasons and circumstances.

It is ordered that the bill be dismissed, with costs.