## CLARKE v. BOORMAN'S EXECUTORS.

1. The construction of a will on the question of estate in fee, or life estate with vested remainder, left undecided, with comments on the inefficiency of rules of decision and decided cases as guides.

2. A violation of trust growing out of a mistaken construction of a will by the executors, unaccompanied by fraudulent intent, is within the ten years statute of limitation of the State of New York concerning actions for relief in cases of trust not cognizable by courts of law.

3. The court expresses itself as inclined to the opinion that such a case is not within the protection of the statute which allows bills for relief on the ground of fraud, to be filed within six years after the discovery of the fraud.

4. Where the party interested in his lifetime had notice of all the facts which constituted the ground of fraud alleged in the bill, and for eight years that he lived after the cause of action accrued to him, with notice of his rights and of the whole transaction, brought no suit nor set up any claim, his heirs are not entitled to the benefit of this exemption from the bar of the statute on the ground of recent discovery of the fraud.

5. When a trustee has closed his trust relation to the property and to the *cestui que trust,* and parted with all control of the property, the statutes of limitation run in his favor, notwithstanding it is an express trust.

6. The general doctrines of courts of equity concerning lapse of time, laches,

and stale claims, will protect the executors of a trustee sued after his death for matters growing out of the trust which occurred forty years before suit brought, which were known to the ancestor under whom the plaintiffs claim for over twenty years before his death, and where the suit is brought by those heirs fourteen years after *his* death, and two years after the death of the trustee, and where no person connected with the transactions complained of remains alive.

APPEAL from the Circuit Court for the Southern District of New York; the case being thus:

James R. Smith, a merchant of New York, died in June, 1817, leaving a will, which was duly proved on the 11th day of that month. By this will he appointed as his executors Hannah Smith, his widow, Andrew Foster, John Thomson, James Boorman, and Matthew St. Clair Clarke. All of them qualified as trustees except Foster, but before any of the transactions under the will which were the subject of the present suit took place, the acting executors were reduced to Boorman and Clarke. The testator authorized his executors to sell the whole or any part of his real estate in their discretion, and by a codicil he directed the disposition of that part of his estate destined for his children. Of these there were four, namely, Jeanet (then married to John X. Clarke), Hannah (married to Matthew St. Clair Clarke, one of the executors), Elizabeth (a minor, unmarried), and James (a minor, unmarried).

After providing for the payment of specific bequests, education and care of the minors, and declaring that the residue of his estate should be equally divided among these four children, share and share alike, and directing that his son James should not come into the full possession of his portion until he arrived at the age of twenty-five years, this paragraph of the twelfth clause of the codicil succeeds, which was the foundation of the present suit. It was verbatim, as follows:

"I further direct that my daughters Jeanet, Hannah, and Elizabeth, if she should arrive at the age of twenty-one years, shall have the privilege of expending and appropriating, by and with the consent of the executors, one-third part of their por-

tion of my estate herein devised to them, in such manner as they may think proper, and over which, when so appropriated, they shall have absolute control; and the remaining two-thirds of the portions or shares of my daughters shall be held separate and distinct and not liable to the control, debts, or engagements of either of their husbands which they now have or may hereafter have, as well those who are married as she who may hereafter marry [giving, however, to the husbands of either or all of them in case the wife shall die first, either with or without issue, the income of said reserved part of my estate, as long as he shall live, arising from his wife's portion, and after his death then to the child or children of my said daughter so dying], and if either of my daughters shall die without lawful issue, or having issue which shall not attain the age of twenty-one years and [*sic*] without issue, then the share or portion of my said daughter after the death of her husband, or if there be no husband living at her death, shall go and be divided among my other children, share and share alike, and to their issue, in case of the death of either of them, share and share alike, such issue to take the portion that would have belonged to his, her, or their father or mother."

The controversy concerned the interest here devised to Jeanet Clarke. At the time of the making of this codicil, and of the death of the testator, she had a son, George, born in 1815, who died in October, 1855. His father, John X. Clarke, died in 1824, and his mother, Jeanet, died in 1847. The complainants in this suit were the children of the said George, the grandchildren of Jeanet Clarke, mentioned in the codicil, and the great-grandchildren of the testator. They alleged that by the true construction of this codicil, as applied to the foregoing facts, Jeanet Clarke took but a life estate in the real property, or a life interest in the proceeds of sale so far as it might have been sold, and that their father, George, son of Jeanet, had a vested remainder or interest in the property so devised to Jeanet. They charged that the two executors, Boorman and Clarke, in violation of their duties as executors and trustees, and in fraud of the rights of said George, sold the real estate which was the chief part of the testator's property left to the opera-

tion of this codicil, and contrived that it should come to the hands of said Jeanet Clarke, divested of his interest or title in it; that settlements and arrangements were made with her by reason of undue influence of Matthew St. Clair Clarke, one of said executors, with whom she resided, by which the executors pretended to have been discharged from the obligations of their trust, and that said Clarke, in effect, reaped all the benefit of such arrangements at the expense of their ancestor, the said George.

The real estate having passed by these conveyances of the executors into the hands of innocent purchasers, divested of the trust in favor of said George, and Matthew St. Clair Clarke having long since died insolvent, and the said Boorman having also died in 1866, these complainants sought by the present bill against the executors of Boorman, to hold his estate responsible for the wrong done to their father by Boorman's participation in the violation of the trust, and the fraud upon his rights.

The transaction which was charged upon Boorman as a violation of his trust, and a fraud on the rights of George Clarke, was thus: In 1829, the minor son, James Smith, having arrived at majority, the debts and specific legacies left by the testator being paid, and the estate being settled except as respected the general residue, he, the three daughters, and the executors Boorman and Matthew St. Clair Clarke, proceeded to settle this residue. It was divided by them into four parts, agreed to be of equal value. One of these parts the executors and the three daughters conveyed, on the 15th of November, 1829, to James Smith, in fee, as his share under his father's will, and he accepted it in form as such. Conveyances were made on the same day in similar form, *mutatis mutandis*, to each of the daughters, of specific property agreed on and valued as one-third of their fourths, which thirds by the terms of the codicil were to be at their " absolute control."

Up to this point of what was done, no objection was taken in the present proceeding.

But there still remained, of course, in the hands of the

executors two-thirds of three several one-fourths.  The objection was as to what was now done with these, or rather with the two-thirds of the fourth devised for Mrs. Jeanet Clarke and her children, husband, &c.  That part of the matter was thus:

On the 26th of December, 1829, the two executors, James Smith, and the three daughters, with their husbands, conveyed by deed—the executors reciting in it that they were acting in pursuance of the power contained in the will—the whole, in a body, of this remaining residue—the same being composed chiefly of lots of ground in the city and State of New York—to one Robert Dyson in fee for the consideration as expressed in the deed of $64,710.39, in cash paid to Matthew St. Clair Clarke, and which sum he acknowledged to have received.  This conveyance included, of course, the two-thirds of Mrs. Clarke's fourth.  In all this transaction Boorman seemed to have taken a passive rather than active part.  In what he did, however, he acted under the advice of P. W. Radcliffe, Esq., of the New York bar, a gentleman well reputed at that bar for integrity, law-learning, and care in all that he either did or advised.

As a part of this arrangement, Matthew St. Clair Clarke, James Smith, Jeanet Clarke, and her sister Elizabeth, executed an instrument of indemnity to Boorman.  It recited the provisions of the twelfth clause of the codicil, the conveyance of real estate to the son for his one-fourth share, the conveyance of other real estate for the one-third part of the share of each daughter, the conveyance to Dyson, the fact that no portion of the consideration of the sale to Dyson had been received by Boorman, but that it had, with the consent of all parties interested, gone exclusively into the hands of Matthew St. Clair Clarke, and the fact that Boorman had accounted for all the effects of the estate which had come to his hands, and had discharged himself of all the trusts reposed in him by the will and codicil, and then discharged Boorman from all moneys which he could have received in his trust, and from all claims concerning the estate of the testator, or any trust relating thereto, and agreed "to

indemnify him from all demands by reason of his having executed any of the conveyances thereinbefore mentioned, or by reason of any other thing by him done, committed, or suffered, concerning the estate of the testator, whether under the trusts in the will and codicil, or otherwise."

On the same day that the conveyance abovementioned was made to Dyson, Dyson reconveyed to each of the three daughters one-third in specific lots of the whole, the consideration as expressed in the deeds being,

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jeanet, . | . | . | . | . | . | . | . | . $21,573 13 |
| Hannah, | . | . | . | . | . | . | . | . 21,614 56 |
| Elizabeth, | . | . | . | . | . | . | . | . 21,522 70 |
| | | | | | | | | $64,710 39 |

The lots in New York City having increased in value, Mrs. Jeanet Clarke in 1843 advertised for sale at public auction all the lots conveyed to her, and they were so sold. She was at this time resident in Washington, and in the family of Matthew St. Clair Clarke, of that city, who, as already said, had married her sister Hannah. Her son George, already mentioned, who was born in 1815, and was therefore twenty-eight years old, and at the time about to marry, went to New York to attend to the matter of the sales. When he got there, he called upon L. B. Woodruff, Esq., then at the bar and now the Circuit judge for the Second Circuit of the United States, to obtain Mr. Woodruff's professional assistance in the preparation of the deeds, bonds, and mortgages, and generally to superintend the closing of the matter of the sale of the lots. The deeds having been prepared (five in number), George took them to Washington, where they were executed by his mother. The consideration-money was $7515. Soon after the deeds had been thus prepared and ready for delivery to the purchasers, Mr. Woodruff was called on by Mr. Andrew Thomson, Mr. Stephen Cambreleng, and Mr. Peter De Witt, members of the bar, who had been requested by different purchasers at the sale, to examine the title of the lots sold, and informed by them that they had doubts about the validity of the title

which Mrs. Clarke proposed to convey, the doubts being founded on the language of her father's will. The question, as the same was now recalled by Mr. Woodruff after a lapse of twenty-seven years, was "whether under the codicil Jeanet Clarke took an estate in fee; or whether her death without issue would devolve the title upon her brother and sisters or their issue, and, connected with that, whether on the birth of issue, which issue should attain twenty-one years, her estate became absolute; whether it was so before or not, and hence, if she had issue then living who was twenty-one years of age, whether his conveyance would not remove all chance of doubt."

The will of Mr. Smith, the father, being put before Mr. Woodruff, the last-named gentleman endeavored to satisfy the objecting counsel that their doubts were unfounded. Two of them were apparently convinced; but they had already advised their clients to decline the title. Being however now informed that Mrs. Jeanet Clarke had a son— the said George, then in New York—it was finally agreed, if *he* would execute an instrument by way of release or confirmation of the sale, that the hesitating or declining purchasers would be satisfied. George, either " by his presence at all or some of these interviews, or by direct and immediate communication" from Mr. Woodruff, "was informed of the objection made in behalf of the purchasers by their counsel, and that they desired the execution by him of the release or grant," such as is abovementioned. Extracts of the will were had in this discussion; whether a copy of it entire was before the parties did not so plainly appear.

George did accordingly execute a release or grant prepared by Mr. Woodruff, received what money was to be paid, and went home to Washington again. He was soon afterwards married, and long held the post of a clerk (not of the higher grades) in the Treasury. He died in 1855, that is to say, twelve years after these transactions, never having set up title to any of these lots then sold by his mother. His mother, as already said, had died in 1847, having been a widow since 1824.

The children of George—two infants, one aged fifteen and the other eighteen—now, April, 1869, filed this bill, as already said, against the executors of Boorman.

It appeared as part of the case, that in 1861 Boorman, as surviving executor, received the dividends in arrear on $50 worth of stock in a New York bridge company, and sold the stock itself; the produce of both transactions amounting in the whole to $115.

The defendants set up that Jeanot Clarke at the time of the conveyances which she made, A.D. 1829, had a fee simple estate in her two-thirds. They set up also in their answer the New York statutes of limitation, and long acquiescence by George, father of the complainants.

The statutes of limitation then in force were the New York Revised Statutes of 1830, and were as follows:

### "ARTICLE FIRST.

" *Of the time of commencing actions relating to real property.*

"No action for the recovery of any lands, tenements, or hereditaments, or for the recovery of the possession thereof, shall be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the premises in question, within twenty years before the commencement of such action."*

### "ARTICLE SIXTH.

" *Of the time of commencing suits in courts of equity.*

"Whenever there is a concurrent jurisdiction in the courts of common law and in courts of equity, of any cause of action, the provisions of this title limiting a time for the commencement of a suit for such cause of action in a court of common law shall apply to all suits hereafter to be brought for the same cause in the court of chancery.

"Bills for relief, in case of the existence of a trust not cognizable by the courts of common law, and in all other cases not herein provided for, shall be filed within ten years after the cause thereof shall accrue, and not after.

"Bills for relief, on the ground of fraud, shall be filed within

---

* 2 Revised Statutes of New York, 1st ed., A.D. 1830, p. 293, § 5.

six years after the discovery, by the aggrieved party, of the facts constituting such fraud, and not after that time."

The complainants contended, as already said, that Jeanet Clarke's estate was one but for life, with remainder to her son. They also contended that the statutes set up did not apply for several reasons: *First.* Because the claim was for a breach of trust, which no lapse of time would bar. *Secondly.* Because the act of Boorman was a *fraud*, which no time would bar; and, *thirdly*, because George never discovered the fraud; was poor, wholly occupied in providing through the labors of his office for the day that was passing over his head, and subject to the control of Matthew St. Clair Clarke, one of the executors. They further contended that the peculiar remedy in equity against a concealed fraud before adverted to, was allowable against a party who by *mistake* committed or participated in injurious acts.

The defendants denied all *fraud*, and asserted full knowledge of the material facts on the part of George; notice of all material facts to him and ratification by him of the acts complained of as vesting in his mother full control over her reserved two-thirds And they also denied the said allegations of control, undue influence, &c.

The court below considered that when Jeanet sold she had an estate in fee. This view rendered unimportant a consideration of any other parts of the case.

The court observed, however, in regard to the instruments of indemnity taken by Boorman:

"At the time the two-thirds of Jeanet Clarke's share of the estate was conveyed to her (1829) her son was but fourteen years old. So far, therefore, as her share was concerned, Mr. Boorman needed indemnity against the contingency that such son might die under the age of twenty-one years, and without issue, in which case the mother and sisters of Jeanet Clarke, or their issue, would come to take the two-thirds of her share."

*The case was elaborately argued on principle and on the authorities, by Messrs. P. Phillips and L. Janin, for the appellants; and by Mr. Charles O'Conor, contra.*

Mr Justice MILLER delivered the opinion of the court.

The plaintiffs assume, as the foundation of their bill, that by the true construction of the codicil as applied to the facts of the case, Jeanet Clarke took but a life estate in the real property of her father, or a life interest in the proceeds of the sale, so far as it may have been sold, and that their father, George Clarke, had a vested remainder or interest in the property so devised to Jeanet.

The first question, then, which naturally arises in the case as thus presented is, whether the construction which the plaintiffs place upon the codicil is the true one.

Very few classes of questions are more frequent or more perplexing in the courts than the construction of wills. If rules of construction laid down by the courts of the highest character, or the authority of adjudged cases, could meet and solve these difficulties, there would remain no cause of complaint on that subject, for such is the number and variety of these opinions that every form of expression would seem to be met. Especially is this true of the question whether a vested remainder in interest is created after a particular estate, or whether the first taker has a fee simple or full ownership of the property devised. And, in point of fact, when such a question arises the number of authorities cited by counsel, supposed to be conclusive of the case in hand, is very remarkable. Unfortunately, however, these authorities are often conflicting, or arise out of forms of expression so near alike, yet varying in such minute shades of meaning, and are decided on facts or circumstances differing in points, the pertinency of which are so difficult in their application to other cases, that the mind is bewildered and in danger of being misled. To these considerations it is to be added that of all legal instruments wills are the most inartificial, the least to be governed in their construction by the settled use of technical legal terms, the will itself being often the production of persons not only ignorant of law but of the correct use of the language in which it is written. Under this state of the science of the law, as applicable to the construction of wills, it may well be doubted if any other

source of enlightenment in the construction of a will is of much assistance, than the application of natural reason to the language of the instrument under the light which may be thrown upon the intent of the testator by the extrinsic circumstances surrounding its execution, and connecting the parties and the property devised with the testator and with the instrument itself.

These remarks are well illustrated in the case under consideration. It has been argued fully by able counsel on each side. Extensive reference has been made to authorities, the result of careful labor; but, after a full consideration of these, we prefer to decide the case on a point which is equally conclusive of the whole matter, which has been equally well presented, and about which we have no doubt, or hesitation.

The transaction which is charged upon Boorman as a violation of his trust and a fraud upon the rights of George Clarke occurred in 1829. The minor, James Smith, had reached the age of twenty-five; the debts of the testator had all been paid, and the specific bequests of his will carried into effect. It seemed desirable to distribute the assets on hand, consisting mainly of the unsold real estate, among the four children of the testator, for whom it was intended.

This was done first by the executors and the other three devisees conveying to James, in fee, certain real estate which was valued and agreed upon by the parties, and accepted by him as his full, equal one-fourth of the estate of his father under the will.

Similar deeds were made to the three female devisees of the property agreed upon as the one-third part of their respective shares, which was, by the will, to be placed at their unconditional control. These deeds left in the hands of the executors two-thirds of each one-fourth devised to the daughters, in regard to which alone the question of life interest or absolute interest or life estate and remainder arises. The deeds abovementioned are dated November 15th, 1829, and on the 26th day of December the two executors, Boorman and Clarke, and James Smith, Jeanet, Hannah, and Eliza-

beth, and their husbands, united in a conveyance of all the remaining real estate to Robert Dyson.

This deed recited on its face that it was made by the executors in pursuance of the power contained in the will, for the consideration of $64,710.59, paid by Dyson to Matthew St. Clair Clarke, one of the executors. On the same day Dyson, by conveyances to Jeanet, Hannah, and Elizabeth, conveyed to each of them parts of the real estate so conveyed to him, the three deeds covering it all, reciting the consideration at sums in each case as near one-third of the $64,710.59, the consideration of the deed to him, as could well be arranged. These were all deeds purporting to convey the title in fee; and the property has since passed into the hands of *bonâ fide* holders for value. We do not see in these proceedings any reason to believe that either Boorman or Matthew St. Clair Clarke was governed by a fraudulent design. No money was received by either of them. The $64,710.59, recited in the deed to Dyson, as paid to Clarke, was evidently merely nominal, and was satisfied by his conveyances the same day, dividing the property conveyed to him between the three daughters of the testator. The title to all the property came to him, and the title to the specific portions of it passed to them without a dollar actually paid, and the whole of it was a plan carefully devised by a good lawyer, to close up the trust in the hands of the executors, and to partition the property among those supposed to be entitled to it. It does not appear that either Boorman or his lawyer ever believed that the son of Jeanet Clarke, then alive, had any vested interest in the property, and they could have had, therefore, no thought of defrauding him. It is said, in opposition to this view of the matter, that the executors required and received a bond of indemnity, with mortgages upon the property, to save them harmless in regard to this violation of their trust. But we think it sufficiently appears by the evidence that this indemnity had reference to possibilities under supposable doubtful constructions of the will, other than such as gave to the son, George, any interest, cut off or discharged by these transactions.

We do not enter into the question whether the trustees so far departed from their obligations to him under the will, as to make them legally or equitably liable to him for the injury arising from their misconduct; but we only mean to say, that we do not find in the record any evidence of positive, actual fraud with corrupt motive, nor of any effort to conceal what they did from him, or from any one else interested in the transaction.

The reason for not entering into the inquiry any further is, that the plaintiffs come too late.

Whether we look to the statutes of limitations of the State of New York, governing such cases in that State, and, of course, in this court; or to the more general and universal doctrines of courts of equity on the subject of the lapse of time, laches, and stale demands, we are of opinion that this suit cannot be maintained.

The limitation prescribed by the statutes of New York for the recovery of real estate is twenty years in an action at law.

Where there is a concurrent jurisdiction in the courts of common law and in courts of equity, the limitation prescribed by the court of law shall govern the court of equity.

Bills for relief in cases of trust, not cognizable by courts of law, are to be filed within ten years after the cause of action accrued.

Bills for relief on the ground of fraud, must be filed within six years after the discovery of the fraud.

If this were a suit to recover the real estate devised by the testator, the action would be barred at law by the statute, because the right of action of the plaintiffs' ancestor, George Clarke, accrued upon the death of his mother, in 1847, and this suit was commenced in 1869, more than twenty years afterwards. The bill of complaint does, in terms, ask this relief, that is, the possession of the property; and though this is impossible, because the property has passed beyond the control of the defendants, it would seem reasonable that when the plaintiffs ask, in the alternative, for such relief as the court can give instead of the property, the same rule of limi-

tation should govern the courts of equity as would govern the courts of law; and such is the express declaration of the New York statute as regards concurrent remedies in courts of law and chancery.

But, as we have already shown, this is a bill for relief, if any relief can be granted in a case of trust not cognizable in a court of law. It is not for land in possession of the defendant, nor for money in his possession received for the use of the plaintiffs' ancestor, nor for such money which ought to be in his possession, but it is for a well-defined violation of trust by which plaintiffs' ancestor lost the title to property which would otherwise have come to him on the death of his mother, and in failing to secure to him his reversionary interest, when they conveyed it as trustees. It is, therefore, a case falling within the limitation of ten years of the New York statute; because it is a bill for relief in a case of trust not cognizable at law.

It is insisted, however, that in cases of fraudulent violation of trust no length of time will operate as a bar to a suit in equity; and some general expressions found in the language of the courts are much relied on.*

These authorities are all based upon the proposition of actual intentional fraud practiced upon a *cestui que trust* by his trustee. We have already said such is not the case before us.

The statute we have referred to as governing this case makes no such exception, though it is, in terms, applicable alone to cases of trust and to suits in equity.

That statute does, however, contain an exception to the general rule of limitation of ten years, which it prescribes. It is that bills for relief on the ground of fraud must be filed within six years after the discovery of the fraud. The plaintiffs contend that their case comes within the protection of this clause.

We are favored by learned counsel, in answer to this construction, with a very forcible argument in support of the

---

* Michoud *v.* Girod, 4 Howard, 504; Prevost *v.* Gratz, 6 Wheaton, 481; Bowen *v.* Evans, House of Lords Cases, 281.

proposition that the provision above recited is only applicable to a case of fraud intentionally concealed by the party committing it, from the knowledge of the party injured, until the ordinary remedies would be barred by the statute. The argument and authorities cited in its favor are of great weight, and we are not prepared to say the proposition is unsound.   We think, however, we are relieved from the necessity of deciding it by the facts in the case before us.

We are of opinion that the record shows that George Clarke had such knowledge or notice of his rights under the will, and of the transactions of the trustees now complained of, as precludes his heirs from setting up ignorance of these transactions.

It appears that as agent for his mother in the year 1843, when he must have been twenty-eight years old, he went to New York to complete the sale of five different parcels of the land conveyed by Dyson to his mother.   At his request L. B. Woodruff acted as counsel, and prepared the conveyances to the purchasers.   These conveyances he carried to Washington, where they were executed by his mother, and by Matthew St. Clair Clarke as trustee, and were witnessed by him, and carried back by him to New York for delivery. At least two of the purchasers declined to complete the purchase on the ground of a defect of title growing out of the construction of the clause of the will of his grandfather, which is here in dispute.   This difficulty was explained to Woodruff, his mother's counsel, and to him.   It had relation to his own connection with the will, and it related directly to the question, whether, under the circumstances, that he was then in existence, and had attained the age of twenty-one years, his mother's interest in the property was a life estate or a fee simple title.   Counsel for purchasers advised their clients to accept the title, if George would execute a deed of grant or release to the lots, and he did so, warranting the title.   It is not clear whether the will of his grandfather was present during these discussions.   But it is clear that extracts from the will were used.   That he was fully informed that he was referred to in the will in such a manner

as made prudent counsel require a conveyance of *his* rights before they would advise their clients to pay for and accept the title conveyed by his mother, and by Matthew St. Clair Clarke, the executor of that will. The will itself, with all the deeds on which the title depended, was of record, and accessible to him without difficulty. The value of the property conveyed by the five deeds which he witnessed, and in regard to which he acted as his mother's agent in delivering them, and receiving the money, was considerable. The consideration of the five deeds amounted to $7515.

This money passed through his hands, and he signed deeds parting with his interest to perfect the title in the only cases in which he was asked to do so. At this time both Boorman and Matthew St. Clair Clarke were alive. He lived twelve years after this, during eight years of which time, after his mother's death, all his rights were perfect, and his cause of action against them free from obstruction. But during all this time he asserted no claim. If he had rights he was content to waive them. There was nothing to prevent his fullest investigation into all the transactions now complained of. His attention had been called to his interest under the will, to the nature of his mother's title, to the fact that able lawyers considered him as having an interest in the property under that will, yet he lived for more than eight years after his mother's life interest had expired and asserted no claim. His children cannot now, twenty years after this, be heard to say that he was in such ignorance of his rights that the curative influence of statutes of repose shall not operate against him and them.

We think it is equally clear, upon the general principles by which courts of equity are governed in regard to lapse of time as a bar to relief, that plaintiffs come too late. The acts of the trustees, of which complaint is made, were completed in 1829, forty years before the suit is commenced for a redress of the wrong then done to plaintiffs' father. During twenty-two years of that time his right and the right of his children to bring suit was without obstruction or hindrance. Within that time the party injured, the party who

committed the wrong, and all others engaged in the transaction, died. The testator of defendants, the persons whose estate is to be charged if plaintiffs recover, was the last of these to depart, and it would almost seem as if the delay until he who could best explain all that needed explanation, and could most effectually defend his own part in the transaction, had passed away, was intentional.

The fact that these transactions had relation to a trust does not in this instance take the case from within the influence of those salutary principles intended to give protection against stale claims.

It may be conceded that, so long as a trustee continues to exercise his powers as trustee in regard to property, that he can be called to an account in regard to that trust. But when he has parted with all control over the property, and has closed up his relation to the trust, and no longer claims or exercises any authority under the trust, the principles which lie at the foundation of all statutes of limitation assert themselves in his favor, and time begins to cover his past transactions with her mantle of repose. Such is the case before us. With the transfer of the title of the property in 1829, Mr. Boorman intended to, and did, terminate his trust relation to that property. If there was any claim against him after that, which could be asserted by plaintiffs' father, it was a claim for a wrong then done him, and not a claim as of an existing relation of trustee and *cestui que trust*. The act of Mr. Boorman, many years after, in disposing, as executor of the will, of fifty dollars of corporation stock discovered to belong to the estate, neither waived nor recognized as existing any such relation. Every principle of justice and fair dealing, of the security of rights long recognized, of repose of society and the intelligent administration of justice, forbids us to enter upon an inquiry into that transaction forty years after it occurred, when all the parties interested have lived and died without complaining of it, upon the suggestion of a construction of the will different from that held by the parties concerned, and acquiesced in by them through all this time.                DECREE AFFIRMED.