Granger, C. J.
It seems to us that the evidence showed that the testator did not consider Phebe Derthick as one of the deceased children referred to in the 20th or residuary clause of the will. If, before her birth, he had married her mother, the law would presume her legitimacy. But it cannot be fairly claimed that the record before us does more than to show that, at a time when Phebe was several years old, the testator was living with her mother as his wife, and that he acknowledged Andrew as “his son by his first wife.”
While the law of evidence, ex necessitate, permits hearsay as to pedigree; and general reputation that a man and woman lived and cohabited in a community as man and wife, has been held sufficient to establish the fact of marriage, the weight to be given to such evidence varies with the circumstances of each case. No witness of the marriage between Daniel and Phebe’s mother was examined. If such marriage occurred prior to Phebe’s birth, it was celebrated as early as 1783. Of the witnesses for Hilliard’s claims, Philo Taylor was born in 1796 ; Lucy Ann Judd in 1790; Sallie Baldwin in 1791; Mercy G. Alcott in 1797; Jedadiah Gaylord in Í803; and Anne Derthick in 1799. No one of these, therefore, could, of their own knowledge, tell of the cohabitation of Daniel and Phebe’s mother, and its accompanying reputation. Whatever they testified was a repetition of another person’s narrative of the events of years prior to the birth of all of these witnesses. Only two of those witnesses ever heard any of Daniel’s family say anything on the matter. Jedadiah. Gaylord’s mother (a sister of Daniel) told him “ about my (his) uncle Daniel Stewart going away from Connecticut and leaving his wife there and taking another woman with him.” Gaylord added, “ I also heard her say that he left a son, by the wife he left, by the name of Andrew there. When I was a boy Andrew came to my father’s on his way to Ohio to find his father.” Mercy G. Alcott, sister of Jedadiah Gaylord, related what their mother had told her thus: “ I heard mother say he was married in Connecticut; do not recollect who-she said *498 he married, nor when and where; he left his wife in Connecticut with two children and in low circumstances, and his wife in the family way. * * * Andrew was one. As near as I can recollect, the other one’s name was Covil.” Now, Schovil was the maiden name of Phebe’s mother. Mrs. Alcott also testified that Andrew told her “ that his father had fifteen children ; three born in Connecticut and the rest in Ohio.” As she saw Andrew when he was “about 17 years old” of course he could not, and did not, tell her that his father had 12 children born in Ohio. Moreover, if Andrew told her of three children born in Connecticut he included Philo Taylor, who was not his father’s son. It is an undisputed fact that several of the testator’s children were born in New Jersey. Hence we .must conclude that either Andrew was incorrect in his statement, or Mrs. Alcott’s memory of them is defective.
As Andrew was an infant when his father abandoned his mother, anything said by him before he rejoined his father, as to Phebe’s pedigree, was necessarily hearsay from his mother’s side of the house.
In 1795 that mother married Taylor, and subsequently the testator openly visited her at Taylor’s house. ' The tes'tator married another woman while Andrew’s mother was yet living. There is no evidence of any divorce. He acknowledged Andrew. Andrew, before reaching manhood, confidently made the then long and difficult journey from Connecticut to Ohio, to see his father. But no witness speaks of any such acknowledgment of Phebe. Neither Phebe, nor any of her descendants, ever sought recognition until Hilliard visited Athens in 1871. For three fourths of a century there was an absence of recognition on one side, ■and of all claim for such recognition on the other.
It is urged that the testator, when he made his will, supposed that Phebe had died childless. Of this there is no •evidence. Her child was reared to womanhood within five miles of the home of Mrs. Taylor (Andrew’s mother). Philo Taylor saw her there. Mrs. Taylor did not die until Calista was in her teens. Andrew did not leave Connec *499 ticut until after Phebe had died, and her child .had been left at its grandfather Derthick’s, within five miles of his own home. Calista was almost a woman when Philo Taylor came to Athens in 1818. She was married before he left Athens county. Andrew and Philo were half brothers, and Calista was certainly their niece. These facts do not prove that the testator knew of Calista’s existence, but they render improbable the suggestion that he did not know of it.
Andrew married, and had nine children. It • does not appear that he ever named to them Phebe, or her child.
uJames Derthick never told Hilliard of his relationship to Daniel Stewart until after 1850 — when Nelson was more than twenty-five years old. Although told of his supposed great-grandfather’s wealth, of his own heirship, and that Daniel Stewart, in 1853, was more than ninety years old, he made no further inquiry until 1871. Even then he showed no confidence in his claim, and if left to himself, would probably not have asserted it.
The only witness who claims to have ever heard Daniel Stewart speak of leaving more than one child in Connecr ticut, is Peter W. Boyles. Boyles moved into the house of Daniel in the fall of 1857, and Daniel died there in February, 1858. Whatever talks they had were in that interval —Daniel being almost 95 years old. Boyles’ narrative not only conflicts with the power of attorney of June, 1857, but it contains his assertion that Daniel “ wanted me (him) to have A. Gr. Brown to come down so that he could make an alteration in the disposition of his property.” Neither Boyles, nor any other witness, testified that any such message was carried to Brown. The will, the power of attorney, and the entire evidence as to Daniel Stewart’s life, satisfy the mind that if he had desired such a message carried, he would have been obeyed.
Looking at the whole will in the light of the evidence in the record; it is plain that the testator did not, in his own mind, include Phebe among his “ deceased children ” referred to in clause 20. Possibly, if her legitimacy had been clearly *500 established, it would be the duty of the court to hold that in law he did intetad to so include her. But the evidence does not so establish her relationship to the testator.
Leaving this question of pedigree, we turn to the facts presented .in support of the third defense.
In August, 1860, the executors, in open court, declared that their office under the will was at an end; that they had paid out the entire residue to specified persons as proper distributees. The court approved their final account, found that they had fully distributed the estate according to law and the will, and discharged them. From that time the statute of limitations began to run against all persons who had notice of this termination of the trust relation of the executors. While numerous cases thus hold, Justice Milieu, of the Supreme Court of the United States, in Clark v. Boorman’s Exrs., 18 Wall., 493, clearly and concisely stated the rule thus:
“It may be conceded that, so long as a trustee continues to exercise his powers as trustee in regard to property, that he can be called to an account in regard to that trust. But when he has parted with all control over the property, and has closed up his relation to the trust, and no longer claims or exercises any authority under the trust, the principles which lie at the foundation of all statutes of limitation assert themselves in his favor, and time begins to cover his past transactions with her mantle of repose.”
Nelson Hilliard, long a resident of Ohio, was especially bound to take notice of our statutes regulating’the settlement of estates by executors and administrators in the probate court. In Februarjq 1853, he knew that the man whom James Derthick spoke of as his great-grandfather, possessed of a large estate, was a fixed resident of Athens county; that he was then more than ninety years of age, and therefore his death was probably nigh .at hand. He had been told of his relationship and of his probable inheritance. His maternal grandfather had urged him to look after it. After reading D. B. Stewart’s letter he knew that the old man’s death at an early day was probable. Long a *501 resident of Ohio, he knew that her law allowed a limited period for the administration of an estate. He had good reason to believe that Daniel Stewart was dead, and that his estate was being settled in ignorance of his own existence and claims. His voluntary omission to inquire as to the death, and to notify the executors of his claim, produced the distribution without assigning any share to him. True, he knew nothing of the will, but if he was a great-grandson of the decedent he was an heir. Until informed that there was a will he had a right to consider himself as an heir, and therefore having an interest that he ought to make known to those administering upon the estate. If he did not have actual notice of the proceedings in Athens probate court it was his own laches that prevented it. The executors acted in good faith, and without negligence. They gave every notice required, or authorized by law. Having no knowledge of Hilliard, or of his claims, they could not specially notify him. We think his knowledge of the position imposed upon him a duty in favor of the executors.
The error of the trial court was in holding that Hilliard’s notice dated from his visit to Athens in 1871, when he first learned of the will and its contents. But we think that, under the peculiar circumstances hereinbefore detailed he must be held to have known all that proper diligence on his part would have told him. This included everything in the probate court, from the probate of the will to the discharge of the executors. What Hilliard actually knew in January, 1853, “put him upon inquiry.” That being so he should be treated as having learned all that reasonable inquiry would have made known to him. While equity refuses to allow the statute of limitations to run in favor of a trustee, who has disclaimed the trust, until his beneficiary has notice of such disclaimer, it will not allow a beneficiary to remain silent, and without inquiry, while he has good reason to believe that the trustee, innocently ignorant of his claims, is distributing the estate to others, without treating the beneficiary so acting as one having notice of all that his own laches left him ignorant of.
*502 Applying this principle to Hilliard, it is evident that nothing but his own failure to inquire prevented his actual knowledge of the appointment, proceedings, account and discharge of the executors at the time. Certainly the most ordinary diligence would have informed him of everything as early as 1863. The suit was not begun until 1878.
This conclusion requires a reversal of the judgment below and a final judgment for the executors, but we ought to notice the defense in which champerty is pleaded.
The facts have been fully stated. The district court held that the agreement between Hilliard and Welch was champertous. In that holding we concur. But that court decided that the executors could not avail themselves of the champerty; that Hilliard had completed the transfer of his rights to Welch; that it was an executed contract, and could not be annulled. In this we see error.
If Welch and Kessinger had obtained actual possession of Hilliard’s share of the estate in specie, the champertous agreement could not be so used as to dispossess them, or to prevent their recovery against any subsequent wrong-doer. To such, and kindred cases, the doctrine of the trial court well applies.
But the pending action is the identical one for whose prosecution Hilliard and Welch contracted. If the parties to such a contract, by a mere change in its form; the introduction of a few words; by agreeing that the claimant shall assign his claim to the champertor; that the latter shall prosecute the suit in his own name, and pay to his assignor a share of the recovery, can escape the power of the court and force the tribunal which condemns champerty to actively aid the champertor, the common law was indeed blind when it pronounced champertous contracts void.
Courts are not so helpless that they can be rendered powerless by the easy change of words in the contract, or the shifting of parts in a play of champerty. Such tribunals, when not shackled by statute, look through words and form to substance; deal with things, rather than names ; look at what was intended, more than at what was said, or *503 written, in all cases.where evidence, legally admissible, establishes the actual facts. It is plain that the contract before us was skilfully drawn; that the purpose was to commit champerty in such form that it would be impossible for any person, or court, to defeat its object. To find and decree for Welch and Kessinger is to interpose actively in giving effect to a champertous contract. This the court should refuse to do. We think the first defense was one the executors had full right to make; that, the evidence established it, and that upon it judgment ought to have been rendered dismissing the action. Whether Welch was an attorney at law, or not; practicing or not, was immaterial.
In Weakly v. Hall, 13 Ohio, 168, it was held that “ In Ohio there is no statute against champerty, or maintenance, but contracts founded on such considerations are void.” Whether such contract stipulates that the action shall he in the name of the champertor, as purchaser of the claim, he to share the recovery with his assignor, or that the claimant himself shall be plaintiff and allow the champertor .to. control the suit and to receive his share of the recovery, is unimportant if the agreement is actually champertous. The contract is an entirety. It cannot be carried out without the aid of a court. That aid the court should refuse, if satisfied of the champerty, regardless of the form of the agreement. The cases cited' by counsel confirm us in this view. The judgment of the district court is reversed, and the action dismissed at the costs of the plaintiffs below.