HAMPTON R. LUSBY ET AL. *v.* HEZEKIAH COBB ET AL.

1. WILLS. *Construction. Environments of testator.*

It is competent in construing a will to look to the situation of the testator, his environment as related to his estate and devisees or legatees at the time the will is made.

2. SAME. *Kin. Meaning of term.*

The word "kin," standing alone in a will, means such kin as take under the statutes of descent; but where there are other words in the will disclosing, with reasonable certainty, that particular persons were meant to be designated, courts will give the word the meaning the testator attached to it.

3. SAME. *Case. "Kind" used for kin.*

Where a testator devised his estate to "all my blood kind in Louisiana and Texas," and at the time the will was made and at his death he had two half-brothers and one nephew of the whole blood residing in Louisiana and nephews and nieces and grandnephews and grandnieces of the whole blood residing in Texas, the word "kind" should be construed as "kin," and the half-brothers are entitled to a per capita share of the estate.

FROM the chancery court of Washington county.

HON. A. McC. KIMBROUGH, Chancellor.

Cobb and others, appellees, were complainants in the court below; Lusby and others, appellants, were defendants there. From a decree in complainants' favor defendants appealed to the supreme court. The opinion states the case.

*Campbell & Starling,* for appellants.

The principal question presented for consideration is: To whom did J. C. Lusby intend his estate to go, and what did he mean by the words "to all my blood kind in Louisiana and Texas?" The words "blood kind" in this clause unquestionably is the equivalent of "blood kin." (See Century Dictionary.)

So that the clause should be read, "To all my blood kin in Louisiana and Texas." When the testator died, the two half-brothers and one nephew resided in Louisiana, and the rest of the said kindred resided in Texas. In common acceptation, the being a man's kindred is being of his blood, and it is in that sense that the word "kindred" is used in the statute of distributions, so that a bequest to "kindred" is understood to refer to blood relations, without the use of the word "blood." Roper on Legacies, 118.

A devise or bequest to "next of kin" is understood to mean the nearest blood relation in equal degree of the propositus, such relations being determined without regard to the statute of distributions. Jarman on Wills (1893), vol. 2, 112; Hawkins on Wills, 97; 1 Roper, 119.

A devise or bequest to "relations" simply applies only to the person or persons who would, by virtue of the statute of distributions, take the estate under an intestacy, either as next of kin or by representation of next of kin. Such is the construction by a long line of decisions, English and American, adopted for convenience, and to prevent a bequest, so made, from being void for uncertainty. 2 Jarman on Wills, p. 130; 1 Roper on Legacies, 100; Schouler on Wills, sec. 537.

The word "blood," mentioned in the statutes of descent and distribution, has been uniformly construed to include, in its technical, as well as in its natural sense, the half blood. 4 Am. Eng. Enc. Law, 585; *Anderson* v. *Bell,* 29 L. R. A., 541; 1 Roper Leg., 119.

We have not been able to find, after diligent search, a single case in the books wherein language in a devise or bequest exactly like that under consideration has been construed. Had the devise in question been to "next of kin," the half brothers would have taken to the exclusion of the nephews and nieces of the whole blood. 2 Jarman on Wills, 112; 16 Am. & Eng. Enc. Law, 705; *Locke* v. *Locke,* 45 N. J. Eq., 97; 1 Roper, 19. Had the devise in question been simply to "relations," the half

brothers would have taken in common with the nephews and nieces of the whole blood, under the statute of distributions of England, and under that of most of the United States. 2 Jarman on Wills, 135; 16 Am. & Eng. Enc. Law, 704; Schouler on Wills, sec. 537.

Since, therefore, the nephews and nieces of the whole blood of J. C. Lusby would have taken his estate, under the Mississippi statute, had he died intestate, to the exclusion of his half brothers, and since a bequest to "relations" includes only those entitled to take under the statute of distributions, appellees contend that they are entitled to the whole estate to the exclusion of the half brothers. If that be true, and if it be held that the meaning of a bequest to "relations" would vary according as local statutes of distributions may vary, so that the word "relations" would include a certain class under one statute, and a different class under another statute, the devise in question is not to "relations," but to "blood kin," and not only to "blood kin," but "all my blood kin in Louisiana and Texas," which conveys quite a different meaning, as would be commonly understood from a devise to "relations" simply.

It is well settled that, where a bequest is to "relations," and the testator has fixed, in the will, a test by which the number of relations, intended by him to receive his estate, can be ascertained; or where a testator has shown an intention in his will to comprehend relations who would not be entitled to take under the statute of distribution, his intention will prevail, and those entitled to take under the will, will not be limited to those who would be entitled to take under the statute of distribution. 1 Roper on Legacies, 112. Where it is stated that a legacy to such relations of the testator as are not worth five hundred pounds would entitle all relations to the testator, who could show that their property is within the sum mentioned, to share in the legacy, without regard to the limit prescribed within the statute of distribution. See, also 4 Vesey, Jr. P., 719, note 5.

In *Greenwood* v. *Greenwood,* 1 Brown's C. C., 32, a testa-
trix bequeathed her estate to be divided between her "relations"
—*i. e.,* the Greenwoods, the Everits, and Dows. The Everits,
although not related to the testatrix, within the statute of dis-
tribution, were permitted to take jointly with their next of
kin, the Greenwood's and the Dows, on the ground that the
word "relations" is explained by the context of the will, and
extended beyond the confines of the statute. In that case the
testatrix named a family not related to her within the statute
of distribution, and thereby manifested her intention to go
beyond the confines of the statute. So Lusby, by the devise in
question, manifested his intention to go beyond the confines of
our statute by devising his estate to "all his blood kin in Louis-
iana and Texas." The beneficiaries intended by a will may be
ascertained as well by a description of their locality as by name.

As Lusby mentioned the persons intended by him to take
under his will as being in Louisiana and Texas, and as his
two half brothers and one nephew lived in Louisiana, and the
rest of his blood kin lived in Texas, it must be presumed that
he was aware of their locality; and, therefore, as he knew that
only three of his blood kin were in Louisiana, and that two of
these were his half brothers, he surely intended to include them,
when he said "to all my blood kin in Louisiana and Texas."

The intention of the testator, in the construction of a will, is
the great criterion, and courts strain to discover his intention.
Rules of testamentary construction have but a limited and sub-
ordinate application. Certain words and expressions, as given
above, when standing unexplained, acquire from precedents a
somewhat definite meaning; but if it could be once a question,
whether or not technical phrases should conclude a testator's
intention, it is no longer doubtful that his intention is para-
mount. The same literal expression in two wills might demand
the same construction; but unless the two wills are identical
throughout, and dispose of similar fortunes under similar cir-
cumstances, a precedent fails of its full force. Schouler on

Wills, sec. 462; *Boston, etc., Co.* v. *Coffin,* 8 L. R. A., 740; *Masterson* v. *Townsend,* 10 L. R. A., 816; *Vannerson* v. *Culbertson,* 10 Smed. & M., 150; *Sorsby* v. *Vance,* 36 Miss., 564; *Tatum* v. *McLellan,* 50 Miss., 1.

*Shields & Boddie* and *W. S. & Farrar L. McCain,* for appellees.

We insist that the meaning of the will is the same as if it had been couched in these words: I, J. C. Lusby, declare this to be my last will and testament: I constitute my friend, W. M. Paine, my executor, believing him to be the most suitable and competent person to take care of my creditors and wind up my affairs, and I direct that no bond be required of him. My heirs live in Louisiana and Texas, and I desire that my property be divided among them as if I had died intestate.

The original instrument shows on its face that it was drafted by one of very limited education, and it is obvious that the word "kind" is the word "kin" misspelled. As all the heirs, both of the whole blood and of the half blood, resided in Louisiana and Texas, the issue narrows itself down to the single question whether the word "kin," as used in the will is, as we insist it is, the legal equivalent of the word heirs. It is evident that the sole object of the testator, as well as of the draftsman of the will in this particular case, was to name the person who should wind up the affairs of the testator. That being accomplished, the testator had no further will to express.

The adjective "blood," as used in the alleged will, seems to be meaningless. If a bachelor has kin other than blood kin, it is unnecessary, of course, for him to use any word in his will to qualify kin if he wishes them to take his property, since the statute does not give any part of a bachelor's estate to those who are related to him by mere affinity.

Where a man does not mean anything by the use of a particular word in his will, it is a hopeless task for the court to undertake to extract the meaning of that word, and we really

think that in the use of the word "blood," the testator in this case, meant nothing more than is implied by the word kin; but if any meaning whatever can be imputed to the word "blood," it could only have been used to emphasize the idea that the testator wished his property to go to his heirs of the whole blood as distinguished from those of the half blood. If he meant kindred of the whole blood as distinguished from those of the half blood, the phrase he used to express the idea is a very awkward one, we admit, but if "blood" as used in this will does not mean whole blood, then it does not mean anything.

We think it will be agreed also that there is a common impression among laymen that one cannot have heirs if he has never had children, and in this case the word kin was doubtless used by the draftsman and the testator to avoid the, to them, apparent absurdity and incongruity of speaking of a bachelor's heirs.

But even if the testator had in mind as the object of his bounty some person or persons other than his legal heirs, the courts, in construing wills, have found it impracticable to give effect to any such general terms as "relatives," "kin," and the like. Whether we accept the orthodox view that He hath made of one blood all nations, or the more modern and less dignified theory that we are merely tailless specimens of the monkey family, that is to say, whether we accept the idea that all the people in Texas and Louisiana are descendants of the primeval pair, and hence are of kin to us all, or whether our ancestry is to be traced to a different source, it is none the less true that nearly every person has, and doubtless the testator in this case had, a large number of kinsfolk extending into ramifications of distant family connections, and the courts, for practical purposes, have found it to be absolutely essential to fix a limit beyond which they will not undertake to go in distributing the property of an intestate. The books tell us of cases in which the courts have been overwhelmed with people claiming

to be "relatives" of a testator where he had made a provision
for "relatives."

There is but one safe and practicable rule, and that is to
adopt the statute of descents and distribution, and this seems
to be the rule quite universally acted upon in such cases.

The law is thus stated in 2 Woerner's Am. Law of Adminis-
tration, sec. 423: "A gift to 'relations,' without a particular
specification, is necessarily construed as a gift to those who
would take the estate in case of intestacy, because in its widest
sense it would include every degree of consanguinity and thus
render the gift void for uncertainty."

Page on Wills, sec. 529, says: "The popular meaning of the
word 'relatives,' or 'relations,' is that of all persons within any
degree of relationship whatever of consanguinity or affinity.
But when the word 'relations' is used in a will to denote a class
of beneficiaries, it is settled that the law imposes a technical
meaning and not the popular one. The primary meaning of
the word 'relatives,' or 'relations,' is such persons as would
take under the statutes of descents and distribution, if the tes-
tator had died intestate." Jarman on Wills, 130 [972]; 4
Kent's Com., 537, notes; Beach on Wills, sec. 292.

In *Handley* v. *Wrightson*, 60 Md., 198, the testator devised
certain lands to his wife for life, which at her death were "to
be equally divided between her near relatives and mine." In
construing this clause the court said: "The capacity of those
to take under a devise or legacy, who are described as 'rela-
tives,' has been too long upheld by settled legal construction
for legal uncertainty to attach to the term 'near relatives,' used
by the testator in the will before us. In determining who,
under this *nomen collectivum,* are entitled, and in what pro-
portions, recourse, as a general rule, is had to the statute of
distribution. 2 Jarman on Wills (5th Am. ed.), 661; 2 Wms.
on Ex., 1003, and notes; 2 Redfield on Wills (3d ed.), 85.

"In *Whilthorn* v. *Harris*, 2 Vesey, Sr., 527, the bequest was
to all and every person and persons who are near relations to

me. In _Doe_ v. _Over et al.,_ 1 Taunton, 263, the testator gave his freehold estate to his wife for life, to be equally divided at her death among the relations on his side. In the first case the legatees and in the second the devisees, took under the statute of distribution."

In _Drew_ v. _Wakefield,_ 54 Me., 298, it is said: "When the bequest is to relations, the next of kin, according to the statute of distribution, are entitled to the bequest."

In the matter of trusts, where property is given in trust to be distributed among the donor's relations, the same rule applies.

Perry on Trusts, in sec. 256, says: "Courts have adopted the rule of the statute of distributions as a convenient rule in such cases, to prevent such gifts from being void for uncertainty."

The same author says, in sec. 699: "So trusts for 'poor relations' have been considered charitable, and will be confined to such poor relations as are next of kin under the statute of distribution."

It is the settled construction of § 1544, code 1892, the statute of descent and distribution, that brothers of the half blood are postponed to nephews and nieces of the whole bood. See cases cited in notes to § 1544.

_Leroy Percy,_ on same side.

We are aware of the fact that all mankind are kin; that no limitation can be placed upon the remoteness of such kinship; that the fiftieth cousin is embraced within this comprehensive term as well as the twin brother, although the fact of kinship may be much more difficult to establish in the one case than in the other. If all of this class are, as contended by the appellants, entitled to participate per capita in the distribution of an estate, the number of such class who will come forward as claimants to establish their kinship with the "dear departed," will very largely be governed by the size of the estate to be parceled out. The expense and trouble of proving a remote

degree of kinship that would be too great to bear where the
prize is small, would be cheerfully borne where an estate of
magnitude was to be partitioned.    For Lazarus, a brother,
might not claim kinship; for Dives, his kin, would be more
numerous dead than his acquaintances alive.    Within two years,
in the case of *Barnett* v. *Handy,* Amb., 708, four hundred and
fifty-six mourning kin came forward.    As a matter of fact,
under a per capita distribution, more than forty-seven have
already developed in this case.    But the realization of the in-
definiteness of such devisees has long since forced the courts to
specifically define the meaning of such a term.    As succinctly
stated in 2 Jarman on Wills (4th Am. ed.), 33, "The word
relations, taken in its widest extent, embraces an almost illim-
itable range of objects; for it comprehends persons of every
degree of consanguinity, however remote, and hence, unless
some lines were drawn, the effect would be that every such gift
would be void for uncertainty.    In order to avoid this conse-
quence, recourse is had to the statutes of distribution; and it
has long been settled that a bequest to the relations applies to
the person or persons who would take by those statutes;" and
the learned author goes on to say that while formerly this was
doubted as to real estate, that in the case of *Thwaites* v. *Over,*
1 Taunton, 263, the doctrine has been established likewise to
real estate, and the author adds, "The rule which makes the
statute of distributions the guide in these cases is not departed
from on slight grounds," and that the statute of distributions
not only determines the objects of the devise, but also regulates
the proportions in which they take, the next of kin taking *per
stirpes,* not per capita; and from the case cited in 1 Taunton
this definition of the words kin, blood kin, relations, has been
followed by the unbroken current of decisions in England and
in this country, and for centuries the phrase has not been a
vague or indefinite one, but has been crystallized by numerous
judicial decisions into a term, the meaning of which is clearly
understood.    For the English cases so deciding, see notes to

Jarman, *supra;* and some of the American cases so holding are, *Drew* v. *Wakefield,* 54 Maine, 291; *Handel* v. *Waitman,* 60 Md., 198; *Ross* v. *Ross,* 25 Conn., 307; *Varrell* v. *Wendell,* 20 N. H., 431; 2 Williams on Executors (5th ed.), 1003, note; 2 Redfield on Wills, 410, 421; 20 Am. & Eng. Enc. Law (1st ed.), 739, note; 1 Roper on Legacies, 326; Page on Wills, 529.

Was this rule of construction adopted for the purpose of carrying out the intention of the testator? Not at all, except to the extent of carrying out his intention to die testate. It was adopted *ex necessitate rei* by the courts, because, otherwise, the decedent would die intestate by reason of the impossibility of ascertaining the persons who would take; in fact, as stated by Redfield, 2 Redfield on Wills, 410, "In a large proportion of the English cases where this rule has been applied, it has evidently defeated the intention of the testator." Some rule had to be adopted; some specific definition had to be attached to the phrase, and this significance was attached to it by earlier adjudications, and has been followed until the person now using it is using a term freed from all uncertainty and ambiguity; and, as stated by Lord Chancellor Burleigh, in the case of *Rayner* v. *Mobray,* 3 B. C. C., 234, "When once a rule has been laid down, it is best to abide by it. We cannot always be speculating what would have been the best decision in the first instance."

Argued orally by *R. B. Campbell,* for appellant.

Whitfield, C. J., delivered the opinion of the court.

J. C. Lusby, a resident of Washington county, of this state, died therein on the 22d of October, 1900, possessed of an estate worth from $75,000 to $100,000. He was never married, and had neither father nor mother living at the time of his death, but during his life he had two sisters of the whole blood and two brothers of the half blood. His two sisters of the whole

blood died before he did, each of them leaving five children. Two of these children afterwards married, and had children, and then died, one of them leaving a child, and, the other, three children; so that at the time of his death he left surviving him nephews and nieces, grandnephews and grandnieces, as descendants of his sisters of the whole blood, who are the appellees in this case, and two brothers of the half blood, who are the appellants. The two half brothers and one of the nephews resided in Louisiana, and all the rest resided in Texas. On the day of his death he made his last will and testament, disposing of his entire estate in the first item thereof, which is in the following language: "I give, devise, and bequeath all the property, real and personal, mixed and choses in action, I may own at my death, wherever located and situated, to all my blood kind in Louisiana and Texas. Mr. Spink's children in Texas heirs I do not know." There are but two other items in his will, and they relate alone to the appointment of an executor and the payment of his debts. The will was probated in Washington county, and the nephews and nieces and grandnephews and grandnieces of the testator filed their bill in the chancery court of said county against the two half brothers, claiming that they are entitled, under said will, to the whole of said estate to the exclusion of the half brothers, and asked the court to construe said will, and to cancel the claim of the two half brothers as a cloud on their title. The two half brothers answered the bill, claiming that they were entitled to share per capita in said estate. Thereupon the case was heard on bill and answer, and the court decreed that the nephews and nieces and grandnephews and grandnieces of the whole blood were entitled to said estate to the exclusion of the two half brothers, and from that decree the two half brothers have appealed.

The question for solution here presented is this: What did the testator himself mean by the words "all my blood kind in Louisiana and Texas?" Whom did he intend to take his estate? The word "kind" was, of course, used for "kin." It is

doubtless true that the word "kin" standing alone in a will, without anything else to show what kin the testator meant, has received an interpretation supported by innumerable decisions to the effect that the kin meant are such kin as could take under the statute of descent and distribution. This is crystallized, but it must be remarked that it is operative alone in those wills where the testator has used no other words from which the court can determine what particular persons he meant by the mere word "kin." It is just as thoroughly settled as the rule itself that wherever there are other words in the will which disclose with reasonable certainty to the court what particular persons the testator meant by the word "kin," there, his intent being clear, and what he meant by use of the word "kin" being thus made clear, the court will, of course, give to the word "kin" the meaning the testator attached to it, whether that be the same as or different from the technical signification the courts have given the word "kin" when standing alone and wholly unexplained. The object always sought in construing a will is the ascertainment of the testator's intention. That intention must be ascertained from the words used in the will itself, since it is the function of courts merely to interpret, not to make, wills. It is, however, always competent to look to the situation of the testator with respect to his estate, his environment as related to his estate, or his devisees or legatees at the time of the making of the will. What was that environment in this case? Here was a testator having no father nor mother nor wife or children, leaving an estate of about $100,-000 in value, and having nieces and nephews, grandnieces and grandnephews of the whole blood in the state of Texas, and having also one nephew of the whole blood and two brothers of the half blood in Louisiana, at the time of his death and of the execution of this will. He knew what estate he had. He was aware that the kin to whom he proposed to leave his estate were those living in Louisiana and Texas. He had in mind the fact that only one nephew of the whole blood and that two

Opinion of the court.

brothers of the half blood lived in Louisiana at the time. We must deal with him, situated as he was, with the knowledge that he had, put ourselves as far as possible in his place, and, having done that, see if there be in the will language showing what he meant by the use of the words "all my blood kind in Louisiana and Texas." The words "all my blood kind" apply as well to the phrase "in Louisiana" as the one "in Texas," and for the purposes of this case we may read the clause as if written "all my blood kin in Louisiana." It is true, "kin" are, of course, "blood kin," and that the same construction will obtain as if he had said "all my kin in Louisiana." But we cannot concur with counsel for appellees that there is no significance in the words "all my kin," in this connection. Considered in a purely abstract way, the phrase "all my kin" is doubtless equivalent to the phrase "my kin." But when we take into consideration the fact that the testator, who used the phrase, "all my blood kind in Louisiana," knew that he had but one person of the whole blood kin to him in Louisiana, it is inconceivable that he would use the phrase, "all my blood kind in Louisiana," to designate simply one person. There was more than one person of his kin in Louisiana. There were three—two, indeed, of the half blood, but nevertheless "kin," and "blood kin." And it is inconceivable that the testator, with these facts in mind, should have made use of the words, "all my blood kind in Louisiana," to designate just one of the three persons. "All" is a term of plural significance, and it is incongruous to apply it in this will as intended to designate but one. We think it is clear that this testator meant to embrace the two half-brothers within the scope of the words, "all my kind in Louisiana." It would be useless to cite authorities on the one view or the other, in our opinion. They are admirably collected by the very learned counsel of the respective parties. If we were to write pages, we could not make the ground of our opinion any clearer; that ground being that this testator, knowing that he had two brothers of the half blood and only one nephew of

the whole blood—three persons—in Louisiana, must have
meant the word "all" to have its usual plural significance, and
so to embrace the three, and cannot reasonably be held to have
used this word "all" as designating just one person. It is true
enough, if he had had but the one nephew of the whole blood
in Louisiana, the use of the words, "all of my blood kind in
Louisiana," would have applied to such a one; but that is not
the same thing when we come to the matter of ascertaining the
intention of the testator as making the word "all"—a word of
plural significance—designate one of the three, when three
were known to fulfil the condition of residence in Louisiana,
by the testator, when he made the will. It advances the argu-
ment no whit to state—what cannot be denied—that the mere
word "kin," standing by itself, unexplained, is universally held
to mean such kin as can take under the statute of descent and
distribution, if the case be one in which the court, putting itself
in the testator's place, can find from other words used in the
will that his intention was that the word "kin" should have, not
its technical signification, but a meaning which he gives to it
himself by the use of such other words. This testator local-
izes and restricts the kin—none but those who live in Louisiana
and Texas can take. He then says that all such kin in Louisi-
ana and Texas shall take. He has in mind the purpose to ex-
clude, and he uses apt words of locality to so exclude. If
he had meant still further to shut out particular persons,
would he not have used the very simple method of naming
the one nephew of the whole blood in Louisiana? Nothing was
easier. On the contrary, his purpose was to give to all his kin
—those localized in these two states—his property, and we can-
not adopt the construction which would shut out the two half-
brothers by making the word "all" plural in its significance,
and evidently used by him comprehensively, point singly to one
person merely, where three fit the description. We think this
is the natural, obvious, and reasonable interpretation of this
will. As well said by Mr. Schouler, in his work on Wills (sec.

463): "Authority in the mere verbal interpretation of wills carries no great weight, especially if the words and tenor of the whole will are not absolutely identical. The construction given to a verbal expression in one will is no positive criterion for all wills containing the same expression." We heartily approve the wisdom of Mr. Justice Miller's observations in *Clarke* v. *Boorman's Ex'rs,* 18 Wall., 502 (21 L. Ed., 904), where he says: "Of all legal instruments, wills are the most inartificial, the least to be governed in their construction by the settled use of technical legal terms; the will itself being often the production of persons not only ignorant of law, but of the correct use of the language in which it is written. Under this state of the science of the law applicable to the construction of wills, it may well be doubted if any other source of enlightenment in the construction of a will is of much more assistance than the application of natural reason to the language of the instrument, under the light which may be thrown upon the intent of the testator by the extrinsic circumstances concerning its execution, and connecting the parties and the property devised with the testator and with the instrument itself." We also approve of Mr. Justice Taney's remarks, in *Bosley* v. *Wyatt,* 14 How., 390 (14 L. Ed., 468), where he says: "No two wills probably were ever written in precisely the same language throughout; nor any two testators died under the same circumstances in relation to their estate, family, and friends; and it would be very unsafe, as well as unjust, to expound the will of one man by the construction which a court of justice had given to that of another, merely because similar words were used in particular parts of it." Here is a man evidently dealing most comprehensively. He devises a very large estate, of the value of nearly $100,000, in one sentence, with no particular directions. His whole will consists of this devise, in one sentence, and the direction that his debts should be paid, and a nomination of an executor. Manifestly, he dealt in a most sweeping and comprehensive way with his property, without particular-

izing; and just so he designated who should take.   He has but two thoughts in view—to exclude all his kin except those residing in Louisiana and Texas, and include all those thus grouped within his bounty.   He knew that there were three in Louisiana, and so he does not name the one of the whole blood, which would have been easy to do, but uses the broad, comprehensive word "all," of plural significance, meaning, as we think, clearly to apply it to the three, and not meaning to apply it illogically to but one.

*Reversed and remanded.*