### SMITH v. McINTIRE et al.

(Circuit Court, N. D. Ohio, W. D. July 15, 1897.)

**1. WILL—CONSTRUCTION—TRUST IN LANDS—POWER TO SELL TO PAY DEBTS.**

A will required that the debts of the testator should first be paid, and then proceeded: "I give, devise, and bequeath to my wife, in lieu of her dower, the plantation on which we now reside, * * * during her natural life, and all the live stock of every description; also all the household furniture and other items not particularly mentioned and otherwise disposed of in this will, during her natural life, as aforesaid; she, however, first disposing of a sufficiency thereof, to pay my just debts as aforesaid. And at the death of my wife all the property hereby devised or bequeathed to

her as aforesaid, or so much thereof as may then remain unexpended, to my children, and their heirs and assigns forever." The wife was then named as executor. *Held*, that the will conferred on the wife, independently of her office of executrix, a trust in the land, with power to sell it to pay debts, and that, she having sold it, after the lapse of 50 years, and in the absence of proof to the contrary, the presumption would be indulged that she exercised the power for that purpose.

2. SAME—MARRIAGE OF EXECUTRIX—VACATION OF OFFICE.

The Ohio statute in force in 1846, providing that, whenever a single woman appointed as executor should marry, the marriage should vacate her office of executor, was probably not applicable to a wife who was nominated as executor in her husband's will, and who becomes executor, and a single woman, by his death.

3. STATUTE OF LIMITATIONS—CLAIMS AGAINST ESTATE—PRESUMPTION.

After a lapse of nearly fifty years it will be conclusively presumed, in favor of bona fide purchasers for value of real estate sold to pay the debts of an estate, that such debts were not barred by the statute of limitations in force at the time, if it appears that they might have been within any of the exceptions in the statute.

4. ESTOPPEL—DEVISEES OF REMAINDER—DELAY.

Where a testator devised a life estate in real property to his wife, with remainder in fee to his children, all of whom were quite young, and the widow, in the exercise of a doubtful power to sell such real estate to pay debts, conveyed the same in fee simple, remarried, and with her husband and children moved to a distant state, where she remained about 40 years, neither the long delay, inaction, nor the fact that they participated in the distribution of their mother's estate, will estop them from claiming such real estate 10 years after their mother's death, the statute of limitations in such case allowing 21 years.

5. CONSTRUCTION OF WILL—PURCHASERS UNDER POWER—PRESUMPTIONS AFTER 50 YEARS.

Where the construction of a will and the existence of a power under it are brought in question, and found to be doubtful, if a challenge comes after 50 years, the benefit of every possible doubt will be given, and every reasonable presumption will be indulged, in favor of bona fide purchasers for value of lands sold and conveyed by the trustee in the exercise of such doubtful power; and, unless the right of the plaintiffs to recover, and that no such power existed, clearly appear from the language of the will, titles thus acquired will be upheld.

Action at law by A. Lee Smith against John H. McIntire and others to recover real estate. On motion to direct verdict for defendants.

Hurd, Brumback & Thatcher, for plaintiff.

Potter & Emery, for defendants.

HAMMOND, J. Lord Coke observed that "wills, and the construction of them, do more perplex a man than any other learning; and, to make a certain construction of them, this excedit jurisprudentium artem. But," he adds, "I have learned this good rule: always to judge in such cases as near as may be and according to the rules of law." 3 Jarm. Wills, 699; 2 Bulst. 130. Certainly no will could more perplex a man than that we have before us for construction. It is susceptible of at least three different interpretations. It is as follows:

"I, William L. Smith of Williams County, and State of Ohio, do make and publish this my last will and testament in manner and form following, that is to say: first, it is my will that my funeral expenses and all my just debts be fully paid. second, I give, devise and bequeath to my beloved wife, Margaret, in lieu of her dower, the plantation on which we now reside situated in

Town seven, North of Range four East in section eight, containing eighty acres more or less, during her natural life; and all the live stock of every description; also all the household furniture and other items not particularly mentioned and otherwise disposed of in this will during her natural life as aforesaid; she however first disposing of a sufficiency thereof, to pay my just debts as aforesaid.

"And at the death of my wife, all the property hereby devised or bequeathed to her as aforesaid, or so much thereof as may then remain unexpended, to my children and their heirs and assigns forever. And lastly, I hereby constitute and appoint my wife to be Executor for this my last will and testament, revoking and annulling all former wills by me made, and ratifying and confirming this and no other to be my last will and testament.

"William L. Smith [Seal].

"Signed and sealed this seventh day of December, eighteen hundred and forty-three, in presence of
"John Rings.
"Rachel C. Rings."

The will is neatly written, evidently by a man of education, grammatically expressed and punctuated, barring some indistinct and doubtful marks of punctuation. It was evidently written by the testator himself. Analyzing the document by its sentences, phrases, and paragraphs, the structural arrangement is quite clear. First. In the ordinary form, he directs his debts and funeral expenses to be paid. Second. He devises the 80 acres of land on which they lived, which is in controversy in this suit, to his wife for life. Then he disposes of his personal property, particularly mentioned, and in general words, all his other estate, by giving it to his wife, either for life or absolutely, as it may be interpreted; following which he writes the words of such great concern in this litigation, which again refer to the payment of his debts. Then, by a separate paragraph, he blends the real and personal property in a devise and bequest of the remainder in the whole to his children, and appoints his wife executor. It may be doubtful, on an inspection of the original will as to punctuation and capital letters and spaces, whether there are three paragraphs or only two; but it is certain that the disposition made of the real and personal property, so far as it relates to the interest of the wife, and her power over it, is made in a single paragraph and a single sentence, and it may be that the opening provision for the payment of his debts and funeral expenses is also embodied in the same paragraph, and even in the single sentence; and what might have been separate items, paragraphs, or sentences, and ordinarily would be for clear expression, are consolidated by the use of commas and semicolons, thereby very much confusing the meaning of the testator, when sought under the rule of noscitur a sociis, because it is difficult to tell just what association the words and phrases were intended by him to have. He very clearly gives his wife only a life estate in the land, and no larger estate whatever. Whether he gives the personal property to her absolutely, or only for life, or part of it absolutely and part of it for life, is very doubtful, when we look alone at the words by which he gives it to her. If, however, that personal property were in litigation, and it became important to resolve that doubt, it would be resolved, by the paragraph giving the remainder to his children, as giving her only a life estate. The importance of

the phraseology in respect of this is now confined to the association of these words with the great struggle over the other words, "she however first disposing of a sufficiency thereof, to pay my just debts as aforesaid." Whether she took a life estate in the personal property, or took it absolutely, whatever was left at her death "unexpended" goes to the children. But, inasmuch as the words relating to the disputed power are so intimately associated in juxtaposition to the bequest to her of the personal estate, the contention of the plaintiff is that the words, "not particularly mentioned and otherwise disposed of in this will during her natural life as aforesaid," are all to be taken together as an adverbial or descriptive expression of the meaning of the words immediately preceding them, namely, the words "and other items," thus resulting in an absolute bequest of the entire personal property to the wife, with the power of disposing of "a sufficiency thereof" to pay his just debts. It must be conceded that there is great force in this suggestion, particularly when we look at the condition of the family in 1843, when this will was written, and nearly three years afterwards, when the testator died, located almost in the wilderness, upon a farm in the woods, which they were opening and establishing, and under circumstances where one of the old people examined as a witness in this case, living a neighbor to them at that time, says that the chances of making much indebtedness did not exist; and when we consider that he was buried in a coffin made at home, and carried to his grave in the farm wagon, it is probable that neither funeral expenses nor debts, under such circumstances, could involve a very large sum of money, and it is not impossible that he considered his personal property sufficient to pay his debts, and had no thought of creating a power to sell his land for that purpose. Nevertheless, while the court will look at the circumstances under which the testator makes his will, such as the state of his property and of his family and the like, and will be guided by the principle of interpretation by which clauses that compose a complicated sentence are applied to the objects to which they properly belong, as ruled in Boyd v. Talbert, 12 Ohio, 212–214, this kind of parol testimony, even where the will is ambiguous, is not controlling, and will not be allowed to override a contrary intention, fairly manifested by the whole will itself. 3 Jarm. Wills, 705, rules 8–11: Smith v. Bell, 6 Pet. 68; Blake v. Hawkins, 98 U. S. 315–324. Why should we take the words, "she however first disposing of a sufficiency thereof, to pay my just debts as aforesaid," which is the final clause in the sentence and paragraph relating to the wife and her interest and power over the property, and which comes after the last semicolon in the sentence, and, going back, stop at the next preceding semicolon, thereby limiting her power of disposition to the household furniture, which ordinarily a testator does not desire to be applied to the payment of his debts, but rather wishes to keep in the continued use of the household, and such "other items" as are disposed of in that preceding clause? The proof here does not show what these "other items" may be, and it is altogether conjecture to say that there was anything more than a farm wagon, plows, drags, a small library, and such like. Besides, this narrowest construction that is possible under this will

would leave out of her power of disposition "all the live stock of every description," which is the next immediately preceding clause of the sentence between two semicolons. And if we may pass the semicolon, and take that into the power of disposition, why may we not pass the next semicolon, and take in the clause giving her a life estate in the land, thereby extending the power of disposition to pay debts at least to her life estate in the land and the live stock, which, it is suggested, she had absolutely, and not as a life estate? But is it a fair and reasonable construction of this will that there should flow from the husband's pen a provision for his wife's comfort and sustenance during her life, and from the same penful of ink a direction that she should sell that, and nothing more, to pay his debts? It is true that there is much force, as said before, in the suggestion of the conditions surrounding the family, that the debts were small. But, great or small, would a husband, providing for the sustenance and comfort of his wife, so cut down her allowance, and particularly when that which he gives is expressed to be in lieu of her dower, which the law would exempt from any charge for these debts, great or small? Besides, the proof is not wholly wanting that the debts may have been considerable in relation to the value of this whole property. In the first place, there is what I will call the "freak" bond, which no one seems to be able to satisfactorily explain, that she gave on the 17th of August, 1848, about a month before she commenced the sales of this property. That bond is in the sum of $1,600, and is in the form required by a statute then existing in Ohio, allowing a residuary legatee to take the property and give a bond to pay the debts, yet it is absurd to suppose, on the face of this will, that she was in any sense a "residuary legatee." There was also another statute of Ohio, cited from Curwen, allowing heirs, devisees, and distributees to give a bond, and take the property, and pay the outstanding debts. It seems to be conceded that the bond was not given under this statute, and nobody seems to have any explanation now, after nearly 50 years, of the presence of this bond in the administration record, beyond the barest conjectures of counsel. Yet, inasmuch as there are no specific legacies to pay under this will, and whatever gifts of personalty there are were to herself, it is a fair inference that this bond was given to quiet the clamors or apprehensions of creditors, to some considerable amount, in relation to the penalty in the bond of $1,600. More than this, we have the implication, arising out of the fact that there was a wife and an executrix, charged with the duty of paying the debts, engaged in the business, a month afterwards and subsequently, of selling off this property under the assumed powers of this will, or at least with no other title to convey except her own life estate in the same property, which, naturally, she would not desire to appropriate to the payment of her husband's debts, if otherwise she could avoid it. It is true that this implication that she was honestly discharging her duty as wife and executrix in carrying out her husband's intentions may be confronted with another implication,—that she was dishonestly scheming, in conspiracy with her second husband, to deprive her children of the benefit of their remainder interests, and appropriate the property to their own use, and that she was yielding to

the temptation to sell the property off in town lots, and get the money, and remove to another country, which she certainly did. But after 50 years, and the ravages of all that time upon the lives of witnesses and other evidence, would a court adopt the implication of the dishonest purpose rather than the implication of the honest adherence to fiduciary duty? Certainly not. From this anomalous bond and the fact of sales we have at least sufficient proof to counterbalance that of the circumstances of the family so forcibly insisted upon by the plaintiff's counsel, and we come at last to the cardinal rule of construction that in such a counterbalancing we shall adhere to what intention we may reasonably find within the four corners of the will.

There is a more reasonable construction of this will within the four corners of it, and that is to take the words, "she however first disposing of a sufficiency thereof, to pay my just debts as aforesaid," and carry them back over all the semicolons to the very beginning of the will, and then towards the other end of it, to the clause providing the remainder for his children, and the last item appointing his wife the executrix, and to so interpret it that it was his intention to charge his debts upon all his property, both real and personal, mentioned in the will. The words "a sufficiency thereof" will then comprehend all the real and personal property, and the words "to pay my just debts as aforesaid" will go back to the beginning clause, directing that, "first, it is my will that my funeral expenses and all my just debts be fully paid," and leave the devise to her and the bequest to her, whatever they be, and the devise to his children and the bequest to his children, whatever they be, to take effect in actual enjoyment only after she has "first" disposed of "a sufficiency" to pay the debts. Whether this power belongs to her as an individual to whom, as a wife and devisee, a special trust has been confided, or as a wife to whom the general trust of being the executor of the will has been confided, would ordinarily, in practical effect, at least, be unimportant. But we shall presently consider its special importance in this case, and for the present will pass that consideration. It would take days, if not weeks, of time, to go carefully over all the authorities that have been cited in this argument, and which have been sent to me in supplemental briefs since the argument closed, to justify this construction by the citation of authorities. I should like to do this, but the time is not at my command, nor is it necessary. One has only to read very superficially the text-books to see how much litigation has arisen, and what a contrariety of opinion has been expressed in litigation, about innumerable wills, almost as numberless as the sands of the sea, upon the construction whether or not any given words constitute a charge of the debts upon the real estate, or create a power in some donee to sell the real estate to pay the debts. In the case of Fenwick v. Chapman, 9 Pet. 461, the words of the will were these: "And after my debts and funeral charges are paid, I devise and bequeath as follows,"—and they were held by the supreme court of the United States to create a charge upon the real estate in exoneration of a manumitted slave. And this upon the authority of cases cited with such phrases as "after paying debts," "my debts and legacies being first deducted, I devise all my real and personal estate to

J. S.," and the like; and the court quotes approvingly from one of the cases that "very little is sufficient to amount to a charge upon real estate." Moreover, it cites approvingly Trot v. Vernon, 2 Vern. 708, where a testator willed and devised that his debts, legacies, and funeral should be paid in the first place, and then devised his lands to his sister for life, with remainder to her issue, remainder over, and made the sister executrix, and it was decreed that the lands be charged with the debts. Yet, more, the court cites approvingly Earl of Godolphin v. Pennock, 2 Ves. Sr. 270, where it was held that real estate was charged for the payment of debts under a general clause in a will that debts should be first paid and satisfied, and it disapproves of the contrary doctrine in Davis v. Gardiner, 2 P. Wms. 189, and adverts to the fact that many cases, both before and after these decisions, could be found either way. There can scarcely be a doubt upon such a decision as this by the highest court in the land that it is conclusive that this will should be construed to charge the testator's debts upon this real estate. Almost as conclusive is the case of Potter v. Gardner, 12 Wheat. 498, where the opinion was by Chief Justice Marshall, and the language of the will was this: "I give and devise to my beloved son, Ezekiel W. Gardner, and his heirs forever, two-thirds of my Ferry farm, he paying all my just debts out of my said estate,"—in which case it was also held that purchasers, who pay the purchase money to the person authorized to sell are not bound to look to its application, as to which counsel in this case for the defendants cite abundant authority, to which I need not here refer. It is also thoroughly well settled by the cases and authorities cited by the defendants' counsel that this rule that the purchaser is not bound to look to the application of the proceeds extends to and comprehends a presumption that there are debts existing to support the exercise of the power, even where none in fact exist, upon the plain ground that the action of the trustee or executor, whichever the case may be, is conclusive in favor of bona fide purchasers for full value, who are not in any manner engaged in a fraudulent conspiracy with the trustee or executor charged with such a duty, to defraud the remainder-men, the ultimate owners, whose estates are subjected under the power to the charge of the testator for the payment of his debts in the first instance. Elliot v. Merriman, 2 Atk. 41, 1 White & T. Lead. Cas. Eq. 109, note; Hill, Trustees, 506, and note; Story, Eq. Jur. §§ 1129–1131, and cases there cited.

That the power contained in the will was sufficiently executed by the deeds which she made without reference to the will on the face of the deeds is abundantly established by the authorities, and conclusively by the supreme court in the case of Warner v. Insurance Co., 109 U. S. 357, 3 Sup. Ct. 221, in which the ancient English rule to the contrary is disapproved, as it also is in the case of South v. South, 91 Ind. 221, where the authorities are carefully reviewed. See, also, Lee v. Simpson, 134 U. S. 572, 590, 10 Sup. Ct. 631; Batchelor v. Brereton, 112 U. S. 396, 5 Sup. Ct. 180. Here we have in the proof outside of the deeds the facts established by the evidence that the prices paid for the lots were the values of the entire fee, and not alone of the life estate, which was much less; and we have the further fact that the

parties at the time acted consistently with a conveyance of the whole fee, and somewhat inconsistently with the idea of a conveyance only of a life estate. The grantors moved entirely away, and gave no attention to the property such as their fiduciary relation would have required if they had left behind only life tenants; and the grantees proceeded to improve and hold the property as if they owned the entire fee, and not for the life estate of a woman growing old. There cannot be the least doubt that the grantor intended to convey the entire fee under the supposed authority she had under the will. Besides all this, the language of the deeds and their warranties are not the language used in the conveyance of a life estate, but such as is always used in the conveyance of a fee. Under such circumstances the authorities we have just cited preclude the idea that the conveyances should attach to and convey only the life estate which she held.

Many very perplexing and interesting questions raised in the progress of this case on the pleadings, on the evidence, and upon the technical distinctions that have been taken in the law for the construction of wills and the execution of powers have been ably argued by counsel, and I only wish I had the time to carefully review and advert to them in their bearing upon the soundness of this judgment; but that is impossible, and the rulings that have been made during the trial must suffice for the present. It is necessary, however, that we should revert to the distinctions that were taken between a power conferred upon an executor qua executor and one acting as a trustee beyond the office of executor. As before remarked, there would be, ordinarily, for the purpose of this judgment, no practical difference between the two. I have been inclined to think that possibly the technical construction of this will would be that it was the intention of the testator to confer on his wife no other power than that ordinarily conferred on executors in the payment of debts by specific directions to apply property to their payment, the title to which has descended to the heir, or been devised to the heir, and has not been devised to the executor, as this was not, so far as relates to the fee, after the termination of her life estate. But, having reached the conclusion that this will was not the bare and naked devise of a power to sell the land to pay the debts, but was a direct charge upon the land itself, it has seemed to me that, without the words used, the power of the executor to sell it for that purpose might possibly be implied from the language and circumstances of this will. There are many nice technical distinctions upon this subject, arising out of the difference between the devise of the power and the devise of a title and the creation of trusts, that are very perplexing and complicated. But, notwithstanding these, I am satisfied that under the laws of Ohio any executor qua executor might have exercised a power to sell this land to pay the debts. Possibly it could not have been done without the aid of a court of equity or a court of probate decreeing the execution of the trust and the subjection of the property to the lien created by the will. But if any executor, without such aid, should assume to sell the land for the payment of the debts, by direct conveyance, after the lapse of 50 years, it is my belief that neither a court of equity nor a court of law would disturb a title acquired under such defective

execution of the trust, where it appeared that the purchasers were acting bona fide, and not in fraud of the remainder-men, and have paid a fair consideration for the property. However this may be, upon considerations of public policy to be presently adverted to, in a case of even doubtful construction as to the lodgment of the power, a court of law as well as a court of equity would construe it to exist aliunde the office of executor, and to reside in the donee independently as a trustee. The language of this will is broad enough to create such a trust outside of the office of executor, when you have once reached the conclusion, as we have, that the will charges the debts upon the land; and therefore I am prepared to hold, for the purposes of this case, that the wife and life tenant here appointed as executor also was invested in her own right with the power of sale to pay debts, and not by virtue of her office of executor.

There was a statute in existence at the time of these transactions, cited from Curwen, which declared that, whenever a single woman appointed as executor should marry, the marriage should vacate her office as executor; and the decisions under that statute show that such a marriage annuls her power as executor. It may be suggested whether this is applicable to a testator's wife, appointed executor by his will, who becomes executor and a single woman by the very death of the testator himself. It may be that the reason of the statute as shown in the decisions would apply only to a woman who was single at the time she was selected as executor, it being presumed that the testator, having selected a single woman to be his executor, did not intend that she should be executor when that condition was changed. But, if this testator had intended such a result, he could have expressed it in the will, and not relied on the statute at the moment when he selected his wife, a married woman, to be his executor when she became his widow. I am not satisfied that the statute at all applies to a wife who is nominated as executor in her husband's will, and therefore that the office of executor in this instance was vacated when the widow married Miller, her second husband, which she did before the most of these lots were sold. But it is sufficient to say that, if we have properly treated her as a trustee in her own right to exercise this power, then this statute would not apply. 1 Curw. St. p. 714,. § 28; Weyer v. Watt, 48 Ohio St. 545-549, 28 N. E. 670; In re Fagin, 19 Wkly. Law Bull. 149; Pollock v. Hooley (Sup.) 22 N. Y. Supp. 215; Veazie v. McGugin, 40 Ohio St. 365; Mott v. Ackerman, 92 N. Y. 539.

It is also necessary to refer to the question made upon the statute of limitations of four years, in existence at the time of these transactions, whereby claims against an estate were barred if not presented to the executor or administrator and allowed within four years from due notice published. It is argued that, inasmuch as no sales of this property to pay debts were made for two years after the death of the testator,. and the largest part of the property was not sold for more than four years after the death of the testator, the power to sell land to pay debts no longer existed after that statute had barred the claims. It seems to be conceded by counsel for the defendants that if, as a matter of fact, all debts had been barred

by the statute of limitations, the power to sell would no longer exist; but they say that the exceptions to the statute and the law of Ohio in relation to this subject was such that, if a claim was presented to the administrator or executor within the four years, and was allowed, or was by him rejected, or if the claim did not accrue and fall due within the four years, it is not affected by the bar of the four-years statute, and may be, if presented or allowed or sued for at any time before the final exhaustion of the assets; and therefore it is argued, that the presumptions in favor of bona fide purchasers for value, without any participation in fraudulent conspiracies, attach in this case, and in their favor, and it will be conclusively presumed either that the debts, if they existed, were presented to the administrator, and acknowledged or allowed, or that they were not due within the four years, or that they were sued for and put in judgment, and that under the authorities before cited, whether these be facts or not, they would be conclusively presumed in favor of any such purchasers as are above described, everybody being bound by the exercise of the discretion and determination of the trustee that the conditions did exist requiring an exercise of the power, unless it shall appear that there is some fraud between the trustee and those who have purchased the property. We think this is a complete answer to the statute of limitations of four years against the claims against executors.

The defendants have relied with great eagerness and earnestness upon an estoppel upon this plaintiff to recover this possession by reason of the fact that he and his ancestor and the co-heirs of his ancestor have stood by for so many years without complaint, and acquiesced in the sales that had been made by their mother. This great lapse of time is accounted for by two noticeable conditions. In the first place, the life tenant lived for 40 years, nearly, after the death of the testator; but while the life tenant was alive the possession was not adverse to the remainder-men, and they need not sue. Then, again, the remarkable fact is that the law of Ohio gives as much as 21 years to the rightful owner to bring an action to recover his possession of real estate. This plaintiff, and those interested with him, waited for more than 10 years after the life tenant died before this suit was brought. But, if we are to pay any attention to the statute of limitations of Ohio in that behalf, and not to paralyze it by this doctrine of standing by and acquiescence, I cannot see why one having the right to bring an action cannot bring it at any time within the 21 years; and it does not seem to me that the statute can be shortened by any misapplication of the doctrine of estoppel, although a great many of the words and phrases of the text writers and the cases in dealing with the doctrine of estoppel might be broad enough to hold that such a result would ensue. In this case, when the sales first commenced, the children of the testator were all under age, and at the first sales were very much under age; and, being infants, the doctrine of estoppel could not apply to them, at least until after they became of age, and began to look out for themselves. When these children became of age, the mother had removed away from this property to another

farm in the state of Michigan, quite distant from the property, and there is no proof here to show that they ever had any satisfactory knowledge of the existence of their right to sue. And, if they had, what should they do? Should they come down to West Unity, to the purchasers, and solemnly warn them that they had bought their remainder interest without authority, and that they would be held responsible for it? To hold them estopped for not doing this is to simply say that they would be bound to bring some suit during the life of their mother, the life tenant, or immediately after she died, within a less time than the 21 years allowed by the statute of limitations of the state of Ohio. The essential element of an estoppel in pais, that these purchasers and defendants acted upon and were prejudiced by, or in some way injured by, that which their heirs at law did, is wholly wanting in this case; and I see nothing in the proof even tending to show that they are estopped by any silence that they have indulged in, with reference to the sale of their interest by their mother. The proof is too vague and indefinite to raise any such estoppel on that ground.

It is also urged that they are estopped by reason of the fact that when their mother died her property in the Michigan farm, or whatever she had, was divided between these heirs at law and their half-sister, the child of the Miller marriage. The argument is that the Michigan farm and the property held by the mother at the time of her death were purchased with the proceeds of the West Unity lands, which had been sold by her under this will, and that by taking under this division of her estate these heirs at law have acquired or come into possession of the proceeds of the original sales, and have thereby estopped themselves to deny the title of these purchasers by acquiescence in the sale, and receiving a part of the purchase money in this indirect way. In the first place, there is no proof that the property which she held at the time of her death was purchased with the proceeds of the West Unity farm. It may be an inference to be drawn from the condition of the family and the relation of the times to each other. But, at least, it is only conjecture. If a bill were filed to establish a resulting trust in the Michigan property held by the mother at the time of her death, it would utterly fail on the proof we have here, because of the fact that it would not show clearly and definitely that the original purchase money did go into that identical property. Again, it is suggested that, if this be true, yet, inasmuch as the mother had made a warranty deed to these purchasers, guarantying the title which she had conveyed to them, the purchasers would have a debt against the mother, upon eviction, for a breach of the warranty; and that, these heirs at law having taken the property which the purchasers might have subjected for a breach of their warranties, therefore there is an estoppel. This appears to me, with all due deference, far-fetched, and, like the other suggestion just referred to, must fail for the want of any sufficient proof to show that there was anything already liable to any breach of warranty. In fact, there could be no debt until after there was an eviction, and there had never been any eviction; and to say that these heirs at law were to then and

there determine beforehand that their mother's estate would be liable for a breach of her warranty if they recovered their West Unity lands, and that they must, therefore, repudiate and reject all share that there was in her estate, would seem unreasonable. It may be that these Michigan lands were largely the result of their own industry and work during their minority and afterwards, and there is some proof that one of them gave his bounty money to the part payment of the Michigan farm; and the most that can be said is that there are ingenious suggestions of the existence of conditions that might work an estoppel if they were true. There is no sufficient proof of the facts upon which the estoppel is based. Therefore I lay out of the case the defense of estoppel; and, even if it were necessary to submit it to the jury, I should feel constrained to say to the jury that there is nothing in the case even tending to show that there was any act or conduct of these parties to which the purchasers could take exception, by way of acquiescence or sharing in the proceeds, and certainly no proof to show that any of these purchasers had ever been injured by a reliance upon the conduct of any of these heirs at law prior to the time that they brought this suit.

But, while this is true so far as it related to the defense of estoppel, there is a broad principle of public policy, upon which both courts of law and courts of equity proceed, which gives to this delay some effect in spite of the long time allowed by the statute of limitations for the bringing of a suit, and the great lapse of time which has taken place between these transactions and the bringing of this suit,—a period of nearly 50 years. This principle finds illustration in the case of Carver v. Jackson, 4 Pet. 1, 83, and in another case depending upon the same title, and which is substantially the same, the case of Crane v. Morris, 6 Pet. 597–610, where, in aid of a title like these defendants have, it was held as part of the law of evidence that after the lapse of 70 years the bare recital of a lease in a deed, or, as Mr. Justice Story says, without any such recital, the original existence of a lease would be presumed in favor of the defendants, conclusively presumed, and neither its loss, nor its original existence, nor its contents need be proved; somewhat like the old common-law presumption of a grant after 20 years. It also finds illustration in the case of Clarke v. Boorman's Ex'rs, 18 Wall. 493, where Mr. Justice Miller held that, outside of a bar of the statute of limitations, a delay of 40 years before suit is commenced to redress a wrong done to the plaintiff's father, during 22 years of which time the right of his child to bring the suit was without obstruction or hindrance, a court of equity would not tolerate a suit to redress the wrong. Now, it is to be remembered that a court of equity, not being bound by the statute of limitations, but proceeding upon doctrines of its own in regard to laches and the lapse of time, has a larger scope for the exercise of this rule of public policy than a court of law could have, and expressions will be found in many of the cases which say that, notwithstanding the technical doctrine of laches does not apply, the court will nevertheless give effect to the fact that the lapse of time has destroyed the evidence of title and of facts and circumstan-

ces which would protect it. And so I think that in a case like this, where the construction of a will and the existence of a power under it are brought in question, and found to be doubtful, if a challenge comes after 50 years, the court should be inclined to give the benefit of every possible doubt in favor of the defendants in possession, if it appears that they paid a fair price for the property, and were not themselves fraudulent co-conspirators against him who claims to be the rightful owner. Every doubt should be resolved in their favor, and such a possession and such a title will not be disturbed by any construction of the document which is in itself doubtful, but the right of the plaintiff to recover upon the language of the will must be beyond all question clearly established by the language itself. Such is not this case. Now, it is true that this doctrine may result in depriving heirs at law of their title, who in their tender years were deserted by their trustees, and were wronged by the action of those who should have protected them and their title. But when all is said that can be said in this direction, the fact remains in this case that the father of these children trusted their mother with this power. He trusted her in their behalf as well as his own, and he had a right to trust her. He had the right of selection of some one to do what he desired to have done under this will; and, if she has broken her trust, and deserted their interests, there is no reason, either in a court of law or a court of equity, why they should not suffer from the breach rather than these defendants, who, like their father, relied upon her fidelity and her honest action, and paid her a fair price for the property they got, and which they have held unquestioned for 50 years; and in a choice between the two as to which shall suffer, there is no reason why the plaintiffs here should not rather suffer than the defendants. If it were entirely clear upon the language of this will that there never was any trust created by the father, and never any power given by the testator, this reasoning would not apply, and these defendants would suffer, because the will itself would indicate to them that they were buying a worthless title; but where, when they go to the will itself, there is language written by the father in his own words and in his own hand upon which a doubt arises,—such a doubt as that we have dealt with in the decision of this case,—and they, along with the trustee, resolve the doubt in favor of the existence of the power, and proceed to act, if they have not engaged in a fraudulent design and conspiracy to injure the remaindermen, and pay a fair price, and remain in possession unchallenged for 50 years, it does seem to me the doubt about the will, in pursuance of the public policy referred to, should be determined in their favor.

As somewhat pertinent to this observation and the possible usefulness in this case, I may refer to the fact that this principle, as in the cases just cited from the supreme court of the United States, finds illustration in the law of evidence as applicable to the old records which have been introduced here. I think, in pursuance of that principle, it will be, after 50 years, conclusively presumed that the executor under this will qualified, although her oath of qualification is not to be found; that she gave a bond, although the bond

is not to be found; that she received letters testamentary, although the letters are not to be found; and that she had all the authority to pursue in a rightful and regular way, and did pursue, all the necessary requirements of the law to enable her as executor to administer whatever trust devolved upon her under this will qua executor. The old docket entries and journal entries commencing in 1846, at the time Smith died, and all the ancient entries in the dockets and the records associated with these pertaining to Smith's estate, are sufficient recitals, like that of the recital of the lease in the cases just cited, upon which to found the presumption of the existence of these documents, which have been lost by the ravages of 50 years; and, without these entries, I do not know but what it would be conclusively presumed in favor of the defendants that she was executor, and pursued in a regular way the requirements of the law in the administration of that trust. Taking all these things together, notwithstanding the perplexities and complications and technicalities of this case, I have reached the conclusion that on the grounds of public policy, if not otherwise, this will should be construed in favor of the title of the defendants, and this is the ground of my judgment. Of course, I recognize the fact that such a course of reasoning might be misapplied to the injury of those who ought to recover that which has been taken from them; but courts and juries exist for the purpose of administering the law in such cases as best they can, and the intelligence and justice of the courts and juries must be relied upon to avoid any misapplication of these rules of construction.

I have found one case of which I have not any note where it was held that, if it should appear that the plaintiff's suit was a speculative one, the will would not be construed in his favor. It appears here that this plaintiff has acquired the rights of his co-heirs by alleged purchases, which turn out to be without any consideration paid on his part, but only an understanding between him and his co-heirs that, if he recovered anything, they should get something; and on all of the proof as to the method by which he has acquired the right to sue for them there seems to me to be a good deal of speculation on his part, justified, as they say, by the fact that they were themselves too poor to incur the expense of bringing a suit, and the claims were transferred to him because he was willing to assume the burden of the cost. How far these facts should have any influence in rejecting his construction of the will in a doubtful case need not be decided, because, whatever doubt there may be about the construction of this will, there is abundant authority for construing it in the way that we have considered it. And, again, I say that after the lapse of 50 years even a court of law will not incline a ready ear to any construction in the plaintiff's favor of words and phrases that are doubtful in themselves.

For these reasons I have directed a verdict for the defendants.